[L. A. No. 9153. In Bank.—March 7, 1929.]

WILLIAM MORGAN et al., Plaintiffs and Respondents, v. HUGH GOVE et al., Defendants and Respondents; J. G. BECKJORD et al., Appellants.

Fredericks & Hanna and Fredericks, Hanna & Morton for Appellants.

Hugh A. McNary for Plaintiffs and Respondents.

Randall, Bartlett & Rex B. Goodcell, Walter J. Little and Wm. B. Gilroy, *Amici Curiae* in Support of Appellants.

Julius V. Patrosso, *Amicus Curiae* in Support of Respondents.

PRESTON, J.—Action by plaintiffs, as taxpayers, to have declared void for fraud and for a violation of rules of public policy a contract awarded by the city of Watts, in Los Angeles County, to the defendant J. G. Beckjord for the construction of a sewer system for said city. Admittedly the defendant Hoffman is a joint party to said contract with the defendant Beckjord. The other defendants are the city trustees and various city officers of said town, which was a town of the sixth class, organized under the general law, but which, after the commencement of these proceedings, was absorbed by the city of Los Angeles.

Plaintiffs had full relief as against defendants Beckjord and Hoffman. The city trustees and all other defendants were exonerated from blame or culpability in the transaction except defendant A. H. Koebig, Jr., the city engineer. The judgment of the court declared said contract void and absolved the city from all liability thereunder. Defendants Beckjord and Hoffman, as bidders for the contract, have appealed. Appellants' briefs cite practically no authorities, but rest their arguments largely upon a discussion of the evidence, and in reality upon a discussion of the weight of admittedly contradictory evidence.

In February, 1922, this city instituted proceedings to construct a sewer system under the Street Improvement Act of 1911 (Stats. 1911, p. 730). In March, May, June and July of said year bids were called for for said work but for various reasons no contract or contracts resulted. The bids for such work ranged from $442,775 to $666,000. The only things worthy of note at this point are that defendant Hoffman bid for said construction work as follows: In May, $545,000; in June, the same amount; in July, $544,700; that one Daley, who was the agent of one Kennedy, whose part in the transaction will hereinafter appear, bid for said work in May the sum of $490,000. Certain legal difficulties in the proceedings and certain unsatisfactory negotiations with the state board of health were the contributing causes which led to the abandonment by the city in November of said year of these first proceedings. Immediately thereafter, however, new proceedings were instituted and said A. H. Koebig, Jr., city engineer, was required to, and did at that time, file a new set of plans and specifications for said public work. These plans and specifications as made were designed by the city engineer not only to meet the technical objections made against the old ones but in fact altered the entire scheme in a substantial way. This fact is undenied. The amount of deep excavation, for example, was so lessened that the cost of construction was cheapened substantially and in an amount ranging from $53,000 to $100,000.

The court found upon sufficient evidence that the city trustees believed at all times that the changes in the new plans were only technical and that in all substantial particulars affecting the cost of construction they were the same as the old ones and that they continued in this belief up to and including the time of the awarding of the contract as hereinafter noted. The court also in this connection found upon sufficient evidence that said A. H. Koebig, Jr., city engineer, intentionally and designedly kept said board of trustees in ignorance of the existence and materiality of these changes. Bids were again called for by said city trustees and were opened on December 26, 1922, in the presence of all the bidders. The record shows the bids received were as follows: J. C. Beckjord, $445,000; Fred Hoffman, $447,000; John P. Kennedy, $455,000; Charles

Thompson, $483,000. The bid of said Beckjord was accepted. The contract was awarded to him and thereafter the city engineer executed on behalf of the city a contract with him for the said work according to the said plans and specifications. Beckjord immediately sublet the entire work to one Joe Chutuk for the sum of $315,000. This contract with Beckjord is the contract assailed by the plaintiffs in this action upon the charge that the proceedings leading up to it were in violation of the rules of public policy and in addition that it was brought about by out and out fraudulent conduct upon the part of appellants and others.

The court was well warranted under the evidence in finding the existence of the following further facts relating to this transaction: That the said city engineer was desirous of suppressing competitive bidding for said contract for said public work; that he was in league with said bidder Thompson for the purpose of assisting Thompson in securing said contract and to that end he was discouraging all others from bidding upon said public work, doing what he could not only to keep the city trustees in ignorance of the changes that had been made but also to hamper prospective bidders in getting the material information upon which to fix their bids; that he further came in touch with said John P. Kennedy, a bidder who, under the name of Daley, had previously placed a bid for said work, as noted above, and recommended to said Kennedy that he get in touch with said Thompson, and the two did later meet in his (Koebig's) presence; that the result of their negotiations, consummated without the presence of Koebig, was that Thompson offered to Kennedy the sum of $5,000 to refrain from making a competitive bid, but, to the contrary, he was to make what is known as a complimentary bid, which is defined by the witnesses as a bid dictated by the real bidder at a price higher than his own, designed for the purpose of convincing the public body awarding the contract of the reasonableness of the real bidder's figures; that thereafter Kennedy secured access to these plans and specifications and observed the changes which had been made in them; that in a second conversation with Thompson his proposed bonus for said complimentary bid was increased $10,000.

But Kennedy did not stop at this point. Having previously had some relations with the defendant Hoffman, he

dispatched to him at Berkeley, California, a wire, dated December 16, 1922, which referred to this sewer project, stated that the work had been ''framed'' for Thompson and asked if he was interested in the matter. Hoffman replied by telegram that he was ''much interested,'' would arrive in Los Angeles on December 26th and asked that he be met with ''official advertisement bid blank and information.'' On December 20th, Kennedy wrote Hoffman at the same address, telling him of the conference with Koebig and Thompson and stating that Thompson had said that he did not think it was fair for Kennedy to ''butt into the job'' as he had been put to large expense and was entitled to the contract. Kennedy, in said letter, then referred to the previous bids and charged that Thompson had double-crossed him at that time. He stated that Thompson, while walking down the street with him, inquired about him (Hoffman) and made a proposition that he (Kennedy) put in a complimentary bid, which he had agreed to do. He further stated in said letter that the job was too nice a one for Thompson and his associates to have; that there would be a profit of $175,000 in it; that it would take from $300,000 to $350,000 to finance the work; that Hoffman should have the first $50,000 profit; he the second $50,000, and the remainder should be split in equal shares between them. He explained that the reason he told Thompson he would put in a complimentary bid was in order to keep a line upon what Thompson's bid would be and that he had an idea that Thompson's bid would be ahead of the bid he and Hoffman would make by about $30,000 to $40,000. He wound up the letter by stating that Thompson, he thought, had no idea that he (Hoffman) would want to put in a bid.

Following this communication Hoffman arrived in Los Angeles on the day stated and there met with Beckjord and Kennedy. It was agreed that Kennedy should continue to ''play'' with Thompson in order that they might know the amount of his bid. Kennedy also made an estimate of the cost of the work, which he put at $309,000, and as a result of the conferences the three bids above set forth were made. On the twenty-sixth day of December the bidders were all present. The bids were opened and the award was made to the defendant Beckjord. It should be added that at this time Hoffman admitted that he and Beckjord were

working together in the matter, but any connection with Kennedy or any knowledge of the bid of Thompson was not disclosed. Later Beckjord and Hoffman, acting together, sublet the work to said Chutuk for the sum of $315,000, as aforesaid. The time passed for taking any action in the proceeding itself and plaintiffs, as taxpayers, resorted to this action for the purpose of having said contract declared void.

How the defendants under this state of the record can hope to succeed in their appeal is utterly beyond our comprehension. It is true that they assail Kennedy from every standpoint as unworthy of belief, but the court believed him, and the corroborating circumstances and admissions of the defendants were ample to warrant the court in so believing him, even though it may at the same time have held as despicable the conduct of said witness. Moreover, there are at least two, if not more, principles of law which forbid appellants from securing relief.

■ First, there is evidence warranting the conclusion that Koebig and Thompson conspired together to prevent competitive bidding for said contract; that Kennedy knew of said conspiracy and organized a conspiracy of his own with defendants Hoffman and Beckjord, also for the purpose of suppressing competitive bidding for said work. The two organizations, connected by Kennedy, had for their object the suppression of competition in said bidding, and while it is true that Thompson was deceived and betrayed by Kennedy, it is also true that the prime and sole object of the organization, so far as the rights of the city and the public were concerned, was to suppress competition in the bidding. To grant appellants relief upon the ground that they deceived and betrayed Thompson, and that their bid was in fact competitive as to him, would be to put a premium on their own misconduct; therefore, it may truly be said that the contract was the direct and proximate result of the fraud participated in by these defendants. ■ But even though it should be held that Thompson's bid was a competitive bid, and only Kennedy and appellants were in the combine, this in and of itself is sufficient reason for denying relief to defendants, or either of them, in this action, upon the ground that the tendency of their acts was to suppress competitive bidding and a rule of public policy requires a refusal of their claim to the contract.

■ Whether or not a combination such as this succeeds is immaterial. The only question is whether such combination has the tendency or the necessary effect of lessening in some degree the competition which should surround the bidding for the public work. This may be illustrated by reflecting upon what the effect upon the minds of the public authorities might have been when they saw these three bids, Hoffman's, Beckjord's and Thompson's. They would immediately have been warranted in coming to the conclusion that the figures bid were approximately correct and reasonable or else three independent minds would not have reached so nearly the same estimate. ■ This is not a case of joint bidders where the facts are known. It is a case where a combination between the bidders was concealed and the public authorities were deceived as to the true nature of the transaction. Thompson has not appealed, but were he before the court, it would be said of him that his bid was not a competitive bid for he thought that through Kennedy he had suppressed all the competition. Consequently his bid would represent the opposite of a competitive bid, being in fact a monopolistic bid.

The law governing this situation is well understood. As early as *Swan* v. *Chorpenning*, 20 Cal. 182, decided in 1862, this court had under review a situation where an agreement respecting government contracts to be awarded to the lowest bidder, which tended to deprive the government of the advantage of competition in the bidding, was declared "unlawful and void." Said agreement was to withdraw a bid already made and not to rebid for the contract. The court, after quoting from the supreme court of the state of New Jersey to the effect that any arrangement which would diminish the number of competitors, lessen the number of proposals or induce any one or more to abandon his intention of making an offer to contract, would be in direct contravention of public policy, ended its decision with the statement that such conduct was undoubtedly injurious in its tendency and the "policy contravened by it" could only be satisfied by declaring any contract so obtained invalid.

The same principle is found in 6 R. C. L., page 809, section 209, and page 813, section 213, where, in the former reference, it is said: "But contracts to suppress bidding are made between buyers or contractors. It is in reference to

such contracts that the rule is said to be universal that agreements which, in their necessary operation upon the action of the parties, tend to restrain their natural rivalry and competition, and thus to result in the disadvantage of the public or third persons, are against the principle of sound public policy, and are void.'' In the latter reference it is said: ''The test of illegality is not the result in a particular case, but the tendency of the contract if recognized as valid.''

This subject is exhaustively treated in the case of *McMullen* v. *Hoffman*, 174 U. S. 639 [45 L. Ed. 1117, 19 Sup. Ct. Rep. 839, see, also, Rose's U. S. Notes], in a situation where only two of several bidders had combined together to share the profits and losses should either obtain the contract for public work. The authorities awarded the contract in ignorance of the existence of said combination. But it later developed that the bids were made under conditions which showed that they were not competitive, but were collusive. The court declared such contract invalid and void as against public policy, and fraudulent, even though there were several other contractors whose bids were not tainted, because of said collusive agreement between the other parties, and this, too, even though some of the legitimate bids approached very closely the bid of the party to whom the contract had been awarded. (See, also, to the same effect, *Swan* v. *Chorpenning, supra; Hardison* v. *Reel,* 154 N. C. 273 [34 L. R. A. (N. S.) 1098, 70 S. E. 463]; *Kuhn* v. *Buhl,* 251 Pa. St. 348 [Ann. Cas. 1917D, 415, 96 Atl. 977]; see, also, note, 45 A. L. R. 549.) We recognize that there is in force in England and Canada a contrary rule, but we are satisfied to adhere to the rule above set forth, in the full belief that it is a salutary one in the administration of public trusts by public bodies.

It is to be noted that the facts of this case do not bring into operation the exception to this rule, situations where two contractors openly, in good faith, and with knowledge of the authority awarding the contract, combine to accomplish an object which neither could effect acting in his individual capacity.

These conclusions render unnecessary the discussion of any assumed contradiction claimed in the findings, for such contradiction, if admitted, would not interfere with the

operation of the principles hereinabove announced. The complaints respecting rulings on the introduction of evidence are so untenable that we consider it unnecessary to refer to them in detail.

The judgment is affirmed.

Langdon, J., Shenk, J., Seawell, J., Richards, J., and Waste, C. J., concurred.

Rehearing denied.

All the Justices present concurred.