[L.A. No. 31628. Feb. 28, 1983.]

TED LEFF, Plaintiff and Appellant, v.
WILLIAM L. GUNTER et al., Defendants and Appellants.

510

COUNSEL

Sidney F. DeGoff, DeGoff & MacGowan, Victoria J. De Goff and Richard Sherman for Plaintiff and Appellant.

Lillick, McHose & Charles, Anthony Liebig and Jennie L. La Prade for Defendants and Appellants.

OPINION

**RICHARDSON, J.**—Defendants William L. Gunter, Robert B. Russell and Robert B. Russell & Associates, a copartnership, appeal from a damage judgment in the amount of $416,666 in favor of plaintiff Ted Leff entered after a jury verdict which found defendants liable for unfair competition by reason of a

breach of a fiduciary duty. Defendants challenge two jury instructions pertaining to the unfair competition theory upon which plaintiff prevailed. They also assert the insufficiency of the evidence to support the verdict. Plaintiff cross-appeals from the trial court's denial of prejudgment interest on his recovery.

We conclude that defendants' appeal lacks merit, and that plaintiff should have been awarded prejudgment interest.

### STATEMENT OF THE CASE

Viewed in a light most favorable to plaintiff, who prevailed, the evidence at trial established the following:

In 1969 plaintiff, who had been a real estate developer for 30 years, became aware that the United States government was soliciting bids for the construction of an Internal Revenue Service (IRS) Center in Fresno, to be leased by the federal government. Bids for the proposed project were to be negotiated. While the contract did not have to be awarded to the lowest bidder, it was required that the bidder have control over any site proposed for the center. Sometime thereafter, plaintiff and Henry Sender, an architectural engineer plaintiff had known for about 17 years and who was then president and chairman of the board of National Building Corporation (NBC), agreed to enter a joint bid on the project. At that time, Sender already had submitted a joint bid with defendants for the construction of a similar IRS Center in Memphis, Tennessee.

On or about January 28, 1970, plaintiff and Sender met in Los Angeles to discuss the Fresno project. Because of the similarity of the requirements of the Fresno and Memphis projects, it occurred to Sender that it would be advantageous to have defendants join plaintiff and Sender in bidding on the Fresno project. During the meeting in Los Angeles, Sender telephoned defendant Gunter, whom he also had known for about 17 years, introduced plaintiff to Gunter as his associate and suggested the joint bid. Gunter thereupon orally agreed, but on condition that he and his other associates retain a two-thirds share in the venture, leaving a one-third interest for plaintiff and Sender. Plaintiff and Sender, in turn, orally agreed to that term. Because Sender's previous joint ventures with Gunter, including the initial agreement on the Memphis project, had always been oral until a contract was awarded, there was nothing unusual about the telephone agreement among Gunter, Sender and plaintiff.

Thereafter, plaintiff kept Sender fully informed concerning developments on the Fresno project, providing him with extensive information relating to building site proposals, engineering data, labor market statistics, water and utility availability, and the like; and plaintiff and Sender worked together to establish the amount of their bid. In similar fashion, Sender forwarded to

Gunter all information relevant to the Fresno project, including the figures for a proposal for construction of the IRS center on property known as the Pilobos site (for its owner). No other developer had included this site in any initial bid on the Fresno project. (Plaintiff believed, apparently erroneously, that he had the exclusive right to an option on the Pilobos site, which option was then held by Pearson Realty Company, a Fresno realtor.)

Sometime after the proposed final bid and related information had been forwarded to Gunter, the latter advised Sender that he and his associates wished to withdraw from the Fresno joint venture. That announcement of withdrawal occurred between late February and late March 1970. Gunter indicated that the reason for this action was the possibility that he and his associates might receive the government contract on the Memphis Center, as to which their earlier bid was still pending, and that they did not want to become financially involved in two major projects at the same time. Gunter did not intimate that either he or his associates contemplated bidding on the Fresno project independently of Sender and plaintiff.

Plaintiff met with a government representative on March 27, 1970, to discuss the joint bid. He was not then aware that Gunter and his associates had withdrawn from the joint venture. That meeting did not go well for plaintiff. However, communication continued between plaintiff and Sender and the government and, on April 24, 1970, the government representative advised plaintiff that the Pilobos site had been selected for the Fresno Center. Plaintiff and Sender were then asked if they would reduce the annual rent to be charged the government pursuant to their bid. Sender indicated they could not.

What plaintiff and Sender were not told was that on April 10, 1970, defendants, together with one Monroe Tapper, had submitted their own joint bid for the same Pilobos site. That bid was tendered in the name of "Russell & Associates," and was signed by defendant Russell. Apparently, Pearson, the realtor holding the option on the Pilobos site, had offered it on a nonexclusive basis to whichever bidder ultimately obtained the contract.

On April 28, 1970, Russell & Associates reduced the rent to be charged pursuant to its bid to an amount significantly lower than that contained in the offer of plaintiff and Sender, and on May 28, 1970, Russell & Associates was awarded the government contract to construct the Fresno IRS Center on the Pilobos site. It was later disclosed that the joint venture composed of defendants Gunter and Russell and Tapper which had made the successful bid in the name of Russell & Associates was created by an oral agreement reached sometime in mid-January of 1970. Until the contract was awarded, neither plaintiff nor Sender was aware of the existence of that association, the bid of which deprived plaintiff's joint venture of the contract.

Plaintiff then sued, alleging five causes of action. (Sender did not join as plaintiff because the board of directors of NBC, which operated nationally and which continued its business relationship with defendant Gunter, voted against it.) Success on the first four counts of the complaint was posited on plaintiff's establishing, inter alia, that Pearson Realty Company breached an agency agreement to hold the option on the Pilobos site for the exclusive benefit of plaintiff. The fifth count more generally alleged that defendants had breached their fiduciary duty to their joint venturers, plaintiff and Sender; and that defendants had competed unfairly with them by secretly bidding against plaintiff and Sender after defendants had withdrawn from the venture, and also by using for defendants' own advantage information acquired during defendants' participation in that joint venture.

The trial was bifurcated. After the jury found defendants liable only on the fifth count, and following a hearing on the issue of damages, the trial court awarded plaintiff $416,666, representing one-sixth share of the profits lost on the Fresno project as a result of defendants' conduct. Plaintiff's motion for prejudgment interest was denied.

## DEFENDANTS' APPEAL

Defendants challenge jury instructions Nos. 44 and 45. No. 44 stated: "You are instructed that where one partner secretly enters into a contract sought to be contracted by the partnership which another partner is negotiating on behalf of the partnership such partner is in violation of his fiduciary duty to the excluded partner." No. 45 directed: "You are further instructed that such fiduciary duty continues for so long as the other party is negotiating on behalf of the original partnership."

■ Defendants assert that these instructions misstate the law by acknowledging a previously unrecognized cause of action for breach of fiduciary duty through fair competition by a former partner after termination of the partnership. Although conceding that it would be improper for one partner to engage in "secret preemptive activities" while the partnership is still in existence, defendants claim that any such taint of impropriety was removed by their withdrawal from the joint venture before Russell & Associates made its independent bid on the Fresno project. In addition, they argue that any negotiation by plaintiff and Sender after Gunter's announcement of defendants' withdrawal from the joint venture cannot have been "on behalf of the original partnership," but rather must have been for plaintiff and Sender alone. Under such circumstances defendants deny any impropriety in their secret competitive bid and negotiations. Defendants further contend that to the extent that these instructions may be construed as asserting only defendants' illegality in competing with a partnership while still members thereof, the instructions were erroneous because there was no evidence of such activity.

We do not agree with these contentions. The instructions advise the jury that a partner's duty not to compete with his partnership with respect to a partnership opportunity which is actively being pursued by the partnership survives his withdrawal therefrom. Defendants have cited no contrary authority. Nor do defendants assert any persuasive reason in logic or principle which relieves a partner from such continuing duty. There is an obvious and essential unfairness in one partner's attempted exploitation of a partnership opportunity for his own personal benefit and to the resulting detriment of his copartners. It may be assumed, although perhaps not always easily proven, that such competition with one's own partnership is greatly facilitated by access to relevant information available only to partners. Moreover, it is equally obvious that a formal disassociation of oneself from a partnership does not change this situation unless the interested parties specifically agree otherwise. It is no less a violation of the trust imposed between partners to permit the personal exploitation of that partnership information and opportunity to the prejudice of one's former associates by the simple expedient of withdrawal from the partnership.

The foregoing reasoning has been well established, and the underlying ethical principles firmly and consistently supported by precedent. In *Page* v. *Page* (1961) 55 Cal.2d 192, 197 [10 Cal.Rptr. 643, 359 P.2d 41], we observed: "We have often stated that 'Partners are trustees for each other, and in all proceedings connected with the conduct of the partnership every partner is bound to act in the highest good faith to his copartner and may not obtain any advantage over him in the partnership affairs by the slightest misrepresentation, concealment, threat or adverse pressure of any kind.' [Citations.]" Thus, in a case where a joint venture was formed to acquire a parcel of land, "the parties assumed the status of fiduciaries and neither one would have had a right, while the joint venture existed, to acquire the subject property to the exclusion of the others." (*Lasry* v. *Lederman* (1957) 147 Cal.App.2d 480, 487 [305 P.2d 663].) Indeed, the purchaser is deemed to hold the property as trustee for his coventurer, even if he paid for it with his own funds. (See *Sadugor* v. *Holstein* (1962) 199 Cal.App.2d 477, 483 [18 Cal.Rptr. 859].)

Similarly, many years ago, in reversing a judgment entered upon a nonsuit in an action by one partner seeking to impose a constructive trust upon his copartner who purchased for his own account property which the partnership sought, we noted: "The existence of the partnership between them placed them in confidential relations toward each other, with respect to the property which was the subject of the agreement. Each occupied the position of a trustee to the other with regard to all the partnership transactions, including the transactions *contemplated* by the firm and constituting the object or purpose for which the partnership was formed." (*Koyer* v. *Willmon* (1907) 150 Cal. 785, 787 [90 P. 135], italics added.) In like fashion, in *Bufalini* v. *DeMichelis* (1955) 136 Cal.App.2d 452, 457 [288 P.2d 934], where a partnership had been formed to

exploit certain mining claims, among others, the appellate court imposed a constructive trust upon a partner who acquired an earlier unspecified claim for himself. In doing so, the court cited the duty of partners in such ventures to "show the highest good faith and regard for the rights of their fellow venturers."

Even more pertinent to the precise issue before us, we noted further in *Page, supra,* 55 Cal.2d at page 197: "A partner may not dissolve a partnership to gain the benefits of the business for himself, unless he fully compensates his copartner for his share of the prospective business opportunity." In *Page,* while we allowed one partner (plaintiff) to dissolve a partnership over the objections of another (defendant), we carefully emphasized the protection which was afforded the defendant in the continuing fiduciary obligation of plaintiff "not to exclude defendant wrongfully from the partnership business opportunity." (*Id.,* at pp. 197-198.)

The notion of a continuing fiduciary duty between former partners is not new. Shortly after *Koyer, supra,* an appellate court in *Donleavey* v. *Johnston* (1914) 24 Cal.App. 319 [141 P. 229], recognized a cause of action by one former partner against a partner who purchased the premises upon which the partnership had been operating, and then refused to lease them to plaintiff who, by previous agreement, was to continue to operate the business on his own after termination of the partnership. The court properly observed: " 'The sound rule is, that [a former partner] cannot make any profit to himself from a secret transaction *initiated* while the relation of trustee and *cestui que trust* exists, no matter when it springs into actual operation.' " (Pp. 328-329, italics in original.)

The *Donleavy* court relied in part upon cases from other states, including *Mitchell* v. *Read* (1874) 61 N.Y. 123. *Mitchell* held that the opportunity to renew a lease of premises upon which a partnership was operating was a valuable partnership asset, even though it was neither a vested nor certain right because the owner need not have renewed the lease to the partnership, and even though any new lease would not take effect until after the partnership was scheduled to terminate by its own terms. (*Id.,* at p. 139.) Such a partnership opportunity may not be appropriated by one partner to the detriment of his copartner, "even after dissolution." (*Ibid.*) The *Mitchell* court declared that its ruling arose "out of the relation of trust and confidence between partners, and is a branch of the rule that a trustee cannot profit from the estate for which he acts. It largely has its roots in a principle of public policy . . . . [Citations.]" (*Id.,* at p. 134.)

In similar fashion, and more recently, in *Lavin* v. *Ehrlich* (1974) 80 Misc.2d 247 [363 N.Y.S.2d 50], a New York appellate court relied upon *Mitchell* in cir-

cumstances which are closely comparable to those in the case before us. In *Lavin*, one Ehrlich withdrew from a "partnership at will." Shortly thereafter, he purchased the real property upon which the partnership, a tax preparation business, had been operating, and subsequently refused to negotiate a lease renewal with his former partnership. The court noted that under *Mitchell* and similar cases it would have been an intolerable breach of fiduciary relationship for Ehrlich to have purchased the premises during the continuation of the partnership and then to evict the partnership after its lease expired. (*Id.*, at p. 248.) Acknowledging that Ehrlich was free to withdraw from the partnership, the court nonetheless rejected his argument—similar to that of defendants here —that such withdrawal released him from all obligations to his former partners. Rather, it held that the fiduciary duty between partners continued during the winding-up period with respect to opportunities which were valuable to the partnership. (*Id.*, at p. 249.) Accordingly, a constructive trust for the benefit of the former partnership was imposed upon Ehrlich's title to the property. (*Id.*, at p. 250.)

The foregoing principles were echoed in *Fouchek* v. *Janicek* (1950) 190 Ore. 251 [225 P.2d 783], in which the Oregon Supreme Court found a breach of fiduciary duty by one partner who, without using confidential information, preempted a business opportunity after termination of the partnership, having secretly negotiated for the opportunity on his own behalf while the partnership was also engaged in negotiations therefor. The partner argued—as do defendants before us—that he had no duty to share with his former partners profits earned from his own activities after the partnership was at an end. As the court graphically noted: "When a partner wrongfully snatches a seed of opportunity from the granary of his firm, he cannot, thereafter, excuse himself from sharing with his copartners the fruits of its planting, even though the harvest occurs after they have terminated their association. The stewardship of the erring member dates from the initial appropriation and continues until he is exonerated by a proper accounting." (*Id.*, at p. 793.) Rephrasing its parable in more mundane terms the *Fouchek* court concluded: "If a member of a copartnership avails himself of information obtained by him in the course of the transaction of partnership business which is within the scope of the firm's business, and thereafter applies it to his own account without the consent or knowledge of his associates, he is liable to account to the firm for any benefit he may obtain from the use of such information." (*Ibid.*)

While it is true that in *Lavin* and *Fouchek* the withdrawing partner had commenced his negotiations in competition with the partnership during his membership therein, and only completed them after its dissolution, the rationale of these cases is equally applicable to the situation before us. From the evidence in the instant matter, the jury could well have concluded that defendants secretly began work on their independent bid during their participation in the joint ven-

ture with plaintiff and Sender, utilizing, at least in part, information acquired by virtue of that participation. After defendants announced their withdrawal from that joint venture, they continued preparation for submission of their independent bid. While their formal bid and direct negotiations with the government representative apparently did not occur until after their withdrawal, their conduct was not thereby immunized. Defendants' attempt to rely upon the technicality of that withdrawal prior to submission of their formal bid strikes us as being "sadly lacking in equity." (See *Lavin, supra,* 80 Misc.2d at p. 249.)

It would be self-deceptive to tolerate defendants' activities by focusing upon the fact alone that they no longer were members of the joint venture on the date on which they undertook formal competitive bidding. Like the withdrawing partners in *Lavin* and *Fouchek,* defendants here sought to appropriate a partnership opportunity for themselves. Their hands are no cleaner because of a more careful orchestration of their clandestine competition.

While no statute precisely controls the issue before us, our foregoing conclusions are fully consistent with existing legislation. Corporations Code section 15021, subdivision (1), for example, provides: "Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction *connected with* the formation, conduct, or liquidation of the partnership or from any use by him of its property." (Italics added.) In addition, section 15030 of that code provides: "On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed."

In *Cotten v. Perishable Air Conditioners* (1941) 18 Cal.2d 575, 577 [116 P.2d 603, 136 A.L.R. 1068], we characterized the identically worded predecessor to the latter statute (former Civ. Code, § 2424) as establishing the general rule that a dissolution of a partnership operates "only with respect to future transactions; as to everything past the partnership continues until all preexisting matters are terminated." We applied the rule in *Cotten* to permit service of process upon a former partner in a lawsuit filed against the partnership after dissolution, thereby complementing and thus confirming the continuing responsibility of a partner with respect to transactions "connected with the . . . conduct, or liquidation of the partnership . . . ." (Corp. Code, § 15021, subd. (1); see *Laux v. Freed* (1960) 53 Cal.2d 512, 522 [2 Cal.Rptr. 265, 348 P.2d 873] ["The duty of good faith and the burden of showing it extend to the dissolution and liquidation of partnership affairs . . . ."].)

Because of our conclusion sustaining the validity of jury instructions Nos. 44 and 45, and the jury's verdict on liability, we do not explore plaintiff's alternative theory based on the duration of a partnership formed for a particular purpose.

In our view, enforcement of the fiduciary obligations of joint venturers within this context does not, as defendants claim, violate any superior public policy which is designed to encourage competitive bidding on public projects. While such latter policy undoubtedly is important and has been cited to invalidate collusive bidding (see, e.g., *McMullen* v. *Hoffman* (1899) 174 U.S. 639 [43 L.Ed. 1117, 19 S.Ct. 839]) and deceptive combinations between favored bidders and public authorities (see, e.g., *Morgan* v. *Gove* (1929) 206 Cal. 627 [275 P. 415, 62 A.L.R. 219]), the case before us involves no such practices. Defendants point to no authority which suggests that enforcement of the fiduciary obligations between partners is of less than paramount importance. Even in times of fiscal constraint, the dilution of a partner's ethical responsibilities is too high a price to pay for the maximizing of bids on public projects.

■ Defendants' challenge to the sufficiency of the evidence to support the jury verdict warrants little discussion. "[W]here the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is *any* substantial evidence to support them; . . . we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom." (*Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, pp. 4236-4238, and cases cited.)

■ Considered in the light most favorable to plaintiff, who prevailed, the evidence at trial supported the conclusion that an oral agreement for a partnership or joint venture existed between plaintiff, Sender and defendants formed for the sole purpose of submitting a successful bid on the Fresno IRS Center project. Useful background information was exchanged between plaintiff and his fellow venturers. It was not denied that defendants withdrew from the joint venture and shortly thereafter, without either the knowledge or approval of the other coventurers, began ultimately successful independent negotiations for construction of the IRS Center on the identical building site which had been proposed by plaintiff's joint venture. Although there was some conflict in the testimony as to whether plaintiff's bid would have been successful in the absence of defendants' secret competitive bid, "*Where the evidence is in conflict, the appellate court will not disturb the verdict of the jury . . . .*" (6 Witkin, *op. cit. supra*, at p. 4236, italics in original.) We thus reject defendants' challenge to the sufficiency of the evidence.

### PLAINTIFF'S CROSS-APPEAL

■ Plaintiff claims that the trial court erred in denying him prejudgment interest on his recovery. In support of that claim, plaintiff relies upon Civil Code section 3287, subdivision (a), which provides in relevant part: "Every person

who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . ."

Plaintiff argues, and defendants do not deny, that his $416,666 recovery was determined by simple mathematics. He asserts that the conceded amount of a mortgage on the completed Fresno IRS Center ($17 million) was subtracted from the fair market value of the center upon its completion in November 1972, as established by the uncontested testimony of plaintiff's appraiser ($19.5 million). The trial court then took the $2.5 million balance between the approved value and the debt, multiplied it by plaintiff's conceded one-sixth share in the original joint venture to arrive at the $416,666 damages awarded. This formula for the computation of plaintiff's damages, while not the only one which the trial court could have utilized, is not challenged by the parties. Based upon its use, plaintiff claims that the clear words of the statute demonstrate his entitlement to interest. We agree.

The trial court did not articulate its reason for denying plaintiff prejudgment interest. In seeking to justify that ruling, defendants assert that plaintiff's damages were not "certain or capable of being made certain by calculation" within the meaning of section 3287. Apparently, defendants concede that if the damages did satisfy this certainty requirement, plaintiff would be entitled to prejudgment interest, just as successful plaintiffs have been permitted similar recovery in a wide variety of other causes of action. (See *Tripp* v. *Swoap* (1976) 17 Cal.3d 671, 681-682 [131 Cal.Rptr. 789, 552 P.2d 749] [welfare benefits recovered pursuant to statute]; *Mass* v. *Board of Education* (1964) 61 Cal.2d 612, 625-626 [39 Cal.Rptr. 739, 394 P.2d 579] [mandamus action based on "general underlying monetary obligation" for back salary]; *Levy-Zentner Co.* v. *Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 797-798 [142 Cal.Rptr. 1] [tort action for damage to property]; *Bank of America* v. *Ryan* (1962) 207 Cal.App.2d 698, 709-710 [24 Cal.Rptr. 739] [breach of fiduciary obligation]; Comment (1958) 5 UCLA L.Rev. 262, 275 ["in California interest is given as a matter of law under section 3287 whether the case is one ex contractu or ex delictu."].)

We do not find persuasive defendants' objection which is based upon the alleged uncertainty of plaintiff's damages. "Damages are deemed certain or capable of being made certain within the provisions of subdivision (a) of section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage. [Citation.]" (*Esgro Central, Inc.* v. *General Ins. Co.* (1971) 20 Cal.App.3d 1054, 1060 [98 Cal.Rptr. 153]; see *Continental Bank* v. *Blethen* (1970) 7 Cal.App.3d 178, 187 [86 Cal.Rptr. 485]; ["the fact that the obligor denies any liability at all does not

make the damages uncertain within the meaning of section 3287"].) Indeed, we have held that even a dispute as to the *amount* of alleged damages (from an earthquake) did not prevent those damages from "being made certain by calculation" within the meaning of section 3287 where the amount of recovery closely approximated plaintiff's claims. (*Koyer* v. *Detroit F. & M. Ins. Co.* (1937) 9 Cal.2d 336, 345-346 [70 P.2d 927]; see also *Levy-Zentner, supra,* 74 Cal.App.3d at pp. 801-802 [discrepancy between plaintiff's claims and recovery after compromise and proof of accounts receivable did not render damages so uncertain as to bar prejudgment interest].)

In interpreting the certainty requirement of section 3287 in *Tripp* v. *Swoap, supra,* 17 Cal.3d at page 682, we observed: "Once an applicant's entitlement to benefits is established, the calculation of the amount of such benefits becomes a mechanical exercise of applying the appropriate standard of assistance. The recovery of wrongfully withheld benefits thus is not subject to the uncertainty that would otherwise bar an award of interest."

Here, also, once plaintiff's entitlement to damages for defendants' breach of fiduciary duty was established, the amount of those damages was calculable—and, apparently, actually calculated—mechanically, on the basis of uncontested and conceded evidence of the value of the IRS Center upon its completion, the balance due on the indebtedness to which it was subject, and the extent of plaintiff's interest in the original joint venture. Defendants offered no evidence to contradict these valuations.

We note the additional requirement for prejudgment interest under section 3287 that plaintiff's entitlement to damages vest "upon a particular day . . . ." Defendants do not claim this vesting requirement was not met. Nor do they challenge the trial court's finding that November 1972—apparently when the Fresno IRS Center was completed—was an appropriate date for assessing the amount of damages suffered by plaintiff. Accordingly, we do not seize upon the trial court's unaccountable failure to designate the precise *day* in November 1972 when plaintiff's right to damages vested to preclude an award of prejudgment interest in this case.

In our view, "Since the requirement of Civil Code section 3287 regarding certainty of damages was met, [plaintiff was] entitled, as a matter of right, to recover prejudgment interest on the sum awarded from the time such sum became due. [Citations.]" (*Leaf* v. *Phil Rauch, Inc.* (1975) 47 Cal.App.3d 371, 376 [120 Cal.Rptr. 749].)

### CONCLUSION

The trial court's judgment is affirmed, except insofar as it failed to award plaintiff prejudgment interest. The case is remanded to the trial court for the

purpose of calculating and awarding plaintiff appropriate prejudgment interest. Plaintiff is to recover his costs on both appeals.

Bird, C. J., Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

The petition of defendants and appellants for a rehearing was denied April 27, 1983.