Filed 2/18/26  Marruenda v. Marruenda CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| FRANCISCO MARRUENDA, | D083850 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2019-00039907-CU-PO-CTL) |
| MANUEL MARRUENDA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kevin A. Enright, Judge.  Affirmed.

Law Offices of James D. Crosby, James D. Crosby, and Tereza L. Callender, for Defendant and Appellant.

Sollertis and Steven J. Roberts, for Plaintiff and Respondent.

Late one night, Francisco Marruenda (Paco) was snatched from his bed, beaten and sedated, driven across the border into Mexico, and committed to a drug rehabilitation facility against his will.  In addition to those involved in the physical taking, Paco blamed his brother, Manuel Marruenda (Manny),

who he believed orchestrated the events as a means to acquire a controlling share in the family business.[1]

Paco and Manny were co-owners of Fiesta Pacific Products, Inc. (Company), which their father, Manuel Marruenda, Sr. (Manuel Sr.), founded. Until 2018, Manuel Sr. held a controlling interest in the Company through a living trust, with Paco and Manny each owning equal minority shares in the Company.

In 2018, Manuel Sr. became seriously ill. As Manuel Sr.'s health deteriorated, Manny told Paco's wife, Rebecca Marruenda, that Paco was taking illicit drugs and presented a danger to her, so Manny sent Rebecca contact information for a drug rehabilitation facility in Mexico. Long-time Company employee David Mangas arrived at Paco's house with two other men to abduct Paco while Manny sat in his car a house or two away. Manny eventually paid the two men for their services.

Soon after Paco's abduction, Manuel Sr. amended his Trust to make Manny the majority owner of the Company and successor trustee of the Trust upon his passing. Manuel Sr. died while Paco was still confined to the facility in Mexico.

Paco and Rebecca subsequently sued multiple defendants, including Manny and Mangas, who is not a party to this appeal. In a bifurcated trial, the jury in a special verdict found Manny conspired with Mangas to abduct Paco, and in so doing he committed assault, battery, and false imprisonment against Paco.

On appeal, Manny contends we must reverse the judgment as to him because no substantial evidence supports the finding he conspired with

---

[1]     During the trial and in their appellate briefs, the brothers are referred to as Paco and Manny. For consistency, we do the same.

Mangas to have Paco taken to and held in Mexico. We disagree and therefore affirm the judgment.

## I.

### A.

Manuel Sr. started the Company, a soft-drink business headquartered in National City, in 1980 and incorporated it in 1986.

By 2018, the Company had operations in about 15 states. At that time, Manuel Sr. owned 52 percent of the Company's shares, with Paco and Manny each owning 24 percent.

The two brothers often "butt[ed] heads" over how to run the Company. They "had two different views on how to do things, and so there was a lot of disagreement" between them.

In 2018, Manuel Sr. became seriously ill. That March, Manuel Sr. "Restate[d]" his Trust, leaving Manny with 52 percent and Paco with 48 percent ownership of the Company upon Manuel Sr.'s passing. In June, Manuel Sr. amended his Trust to leave Paco and Manny each 50 percent ownership of the Company upon his passing.

### B.

Before August 2018, Paco had never been accused of using drugs and had never spoken with anyone, including Rebecca, about drug use.

On August 12, 2018, Paco, along with several other relatives including Manny, visited Manuel Sr. Paco and Manuel Sr. talked mostly about work. Paco and Manny's uncle, Mexico-licensed physician Ramon Escajadillo, and his wife were also there. During a conversation between Paco and the couple, Ramon's wife commented in Paco's presence that Paco looked thin. Nobody said anything to Paco about drugs.

3

Later that day, Paco and Manny's mother, Cristina Marruenda, called Rebecca to inform her that Ramon thought Paco appeared to be under the influence of "synthetic drugs." This was the first time Rebecca suspected her husband's recent weight loss was due to possible drug use and not depression over Manuel Sr.'s deteriorating health like she had thought. Rebecca asked Paco if he was on drugs, which Paco denied. Concerned, Rebecca took away his car keys, wallet, and phone.

Rebecca testified that, two days later, Manny unexpectedly arrived at their home around 11:00 p.m. and told her (1) Paco was "on cocaine," "heroin and some methamphetamine or some other narcotic," and (2) she "needed to hide the knives and guns in the house because [Paco] was going to kill [them]." Manny also told Rebecca he was going to "help" his brother by providing her with the address and phone number of a "rehab" facility in Tijuana, Mexico. The following day, Manny sent Rebecca a "screenshot" from his cell phone containing the facility's address and the name and phone number of a nurse, with instructions to tell the nurse "Remy gave you the info."

Later that day, Rebecca asked Paco to take a drug test but he refused, telling her he wanted to see Manuel Sr. and be alone. At his wife's insistence, however, Paco agreed to see a doctor at some point.

C.

That same night around 11:00 p.m., Mangas, who worked at the Company for years, arrived at Paco and Rebecca's home with two men. Rebecca was "surprised" to see Mangas but assumed he was there to take her husband to an urgent care facility in San Diego. Earlier that evening, Mangas had crossed the border into Mexico to pick up the two men, who had "medication" to sedate Paco.

4

Without Rebecca's permission and while Mangas stood in the doorway, the two men "ran" into Paco's bedroom. Afraid and in "shock," Rebecca saw one of the men holding her husband's neck and the other his feet. Paco, who had been sleeping, awakened to the men holding him down and choking him. As Paco struggled and yelled, one of the men grabbed Paco's groin and hit him in the ribs, while the other pulled his hands back and broke one of his fingers. One of the men then injected Paco's arm with a "needle." A few minutes later, they injected him a second time in the leg, causing him to slowly lose consciousness. Afraid, neither Rebecca nor anyone else in the home, including their then-18-year-old son Paquito, intervened.

Paquito saw the two men enter his home late at night on August 15, go to his father's bedroom, and inject his father in the leg. In "shock," "scared," and crying, Paquito went back to his bedroom and laid on his bed, which was "parallel" to a bedroom window facing the front of the house.

From the window, Paquito saw Manny's car, which he described as an SUV with distinctive "black rims," parked about one or two houses down the street. Paquito saw a "silhouette" inside the car that he recognized as Manny from the "long hair" in a "ponytail." Paquito did not see anyone else in the car. About 20 minutes later, while standing outside on the porch, Paquito saw the same car leave the area.

## D.

After being forcefully drugged, Paco was ushered into a car by Mangas and the two men. Rebecca joined the four men in the car, as she wanted to be with her husband and believed they were taking him to an urgent care center in San Diego. She objected when they crossed the border into Mexico, but Mangas continued driving to the facility located in "Playas in Tijuana." Paco awakened to his wife's objections as they crossed the border.

Mangas drove to the "rehabilitation place" in Tijuana recommended by Manny, which Rebecca described as being "in the middle of nowhere." They all went inside, including Mangas, who met with an administrator. Rebecca saw people "chained up" at the facility. She refused to leave her husband there and told Mangas, "[P]lease take us back home." Once back in the car, Paco also heard his wife repeatedly say, "[L]et's just go back to the United States" and "[L]et's just go home," and made the same request himself. Mangas, however, ignored their pleas and drove farther south to another drug-treatment facility in Ensenada that he later testified was owned by "a brother of an uncle."

E.

Once at the Ensenada facility, an attendant escorted Paco upstairs and told Rebecca to come back the next day with clothes for her husband. That night, Rebecca did not sign papers or obtain any information regarding how long Paco would remain there. She testified that she understood Paco was at the facility because "he had a drug problem and Manny was helping him." After about five minutes, she returned to the car while Mangas talked to the attendant. Mangas then drove her home.

After being escorted upstairs, Paco fell asleep in a room by himself. The following morning, he was placed in a locked "cell" with other individuals and given "pink pills" that made him sleep. While housed in that cell, they handed him "paper[s]" and a pen. Believing he had no choice, Paco signed the papers providing he voluntarily agreed to three months of treatment at the facility.

F.

Manny called Rebecca the morning after she returned from Ensenada. "[U]pset," he said they should have left Paco at the Tijuana facility as

"punishment," and he demanded she return to Mexico and take Paco back to the Tijuana facility he had recommended. Rebecca refused, testifying she felt like she was "going crazy" and did not "understand[]" what was happening to her husband.

Later that day, Rebecca went to the Company office and encountered Manny. He "scream[ed]" at her, said what had happened to Paco was "kidnap," and insisted Paco would be beaten unless she paid $3,000 to the two men who helped abduct her husband. Rebecca refused to pay, telling Manny she was "done with this stupid game." A few days later, Manny told Rebecca he had paid the men $3,000 because they were "harassing" and "calling him" for the money.

## G.

On August 17, 2018, Manuel Sr. made a final change to the Trust, leaving Manny with 63.5 percent and Paco with 36.5 percent ownership in the Company upon his death. Manuel Sr. passed away the next month.

## H.

Paco remained trapped at the Ensenada facility. Though Paco was soon placed with the "general population," the Ensenada facility remained locked down at all times, and its workers threatened Paco with "physical violence" if he tried to escape. Paco could not leave the facility, including to visit Manuel Sr. before he passed away in September or to attend his father's funeral in October 2018. No visitors were allowed, including Rebecca, until Paco had been at the facility for at least 45 days, and visits were restricted to Sundays at lunchtime. During each visit, Paco told his wife he wanted out.

## I.

While Paco was being held in Ensenada, Manny told Paquito that Paco "had to go away" and Paquito needed to "watch out for needles" when he

cleaned his father's workstation at the Company. In September 2018, Manny also told Tabatha Marruenda, Paco and Rebecca's adult daughter, that her father had been using "marijuana, cocaine, [and] methamphetamine," and remarked that was "the type of person [Paco] was."

## J.

Paco was released from the Ensenada facility in early November 2018. On his first day back at the Company later that month, Paco asked Manny to go to lunch to discuss how they, going forward, would run the business given Manuel Sr.'s passing. Appearing uncomfortable, Manny refused the invitation and later that day disclosed their father had changed his Trust to make Manny the majority owner, and he was now in charge of the Company. Angry, Paco replied that over the years he had worked harder than his brother building up the business. Manny replied, "[L]ife ain't fair and that's how it is."

Manny, however, promised to put Paco's new responsibilities at the Company in writing. As time passed and with nothing forthcoming from Manny, Paco found he had little to no involvement in the Company. A few times when she accompanied her father to work, Tabatha heard Manny tell Paco he had no "say in the company." August 2019 was the last time Paco went to work at the Company.

## K.

In July 2019, Paco and Rebecca filed a verified complaint. As relevant here, Paco asserted causes of action against Manny and Mangas for assault, battery, and false imprisonment. He separately alleged they, along with two other defendants, conspired to kidnap him to allow Manny to gain control of the Company and "best[]" his brother, as Manny had been "strongly jealous"

8

of Paco's success and business acumen that he developed "ill-will and malicious intent" toward Paco.

After a lengthy trial involving the testimony of about 20 witnesses, the jury found Manny and Mangas (1) liable for assault, battery, and false imprisonment of Paco, and (2) conspired to commit these causes of action. As to Manny, the jury awarded Paco $1,000,000 in noneconomic damages and $1,090 in past economic loss.

## II.

Manny does not dispute that the underlying assault, battery, and false imprisonment of Paco occurred. He, however, contends that Rebecca and Christina arranged to take Paco to Mexico against his will. Manny thus contends there is "no evidence, much less any substantial evidence," supporting the jury's finding *he* conspired with Mangas to have Paco "drugged, driven to Mexico, and placed into rehab"; and argues the judgment should be reversed as to him. We disagree.

### A.

"It is an elementary, but often overlooked, principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) "In reviewing the evidence on such an appeal, all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible." (*Ibid.*) "The fact that it is possible to draw some inference other than that drawn by

9

the trier of fact is of no consequence." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

In reviewing whether substantial evidence supports a jury's finding, "'we have no power to judge . . . the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.'" (*Leff v. Gunter* (1983) 33 Cal.3d 508, 518.)

B.

The jury found Manny liable for the underlying torts against Paco through conspiracy.

"Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510–511.) A civil conspiracy "must be activated by the commission of an actual tort." (*Id.* at p. 511.)

"A party seeking to establish a civil conspiracy 'must show that each member of the conspiracy acted in concert and came to a mutual understanding to accomplish a common and unlawful plan, and that one or more of them committed an overt act to further it.'" (*AREI II Cases* (2013) 216 Cal.App.4th 1004, 1022.) "It is not enough that the conspirators knew of an intended wrongful act, they had to agree—expressly or tacitly—to achieve it." (*Ibid.* [cleaned up].) Yet "because of the very nature of a conspiracy, 'its existence must often be *inferentially and circumstantially* derived from the character of the acts done, the relations of the parties and other facts and circumstances suggestive of concerted action.'" (*Ibid.*, italics added.)

## C.

Focusing on the character of the acts done, the relations of the parties and other facts and circumstances, we conclude substantial circumstantial evidence, and the inferences to be drawn from such evidence, supports the jury's finding of Manny's involvement in the conspiracy to abduct Paco. (See *Applied Equipment Corp.*, 7 Cal.4th at pp. 510–511; *AREI II Cases,* 216 Cal.App.4th at p. 1022.)

A few days before his brother's abduction, Manny unexpectedly arrived at Paco and Rebecca's home late at night and claimed Paco was using narcotics, and he agreed to "help" the concerned Rebecca by recommending and providing information for the Tijuana facility.

While the two men Mangas had picked up in Mexico injected Paco and prepared to forcibly transport him to Mexico, Manny sat in his car nearby and left around the same time the sedated Paco was being placed into a car by Mangas and the two men. As he drove, Mangas ignored Rebecca's objection when they crossed into Mexico and instead took them to the same Tijuana facility Manny had recommended. Later, when they were leaving the Tijuana facility, Mangas ignored Rebecca's repeated requests to take her *and* Paco home, instead driving farther south to an Ensenada treatment facility he testified was owned by "a brother of an uncle."

These facts support the inference that Manny had knowledge of, and was involved in, Mangas' plan to forcefully take Paco from his home and transport him against his will to Mexico. Manny not only knew the date, time, and location of Paco's abduction, but also where Mangas and the two men would be taking his brother.

Manny's involvement in the conspiracy is further supported by evidence of his behavior the day after the abduction, when he became angry

11

at Rebecca for not leaving Paco at the Tijuana facility, claiming that was his brother's "punishment." A reasonable inference to be drawn from this evidence is that Manny's intention was not to "help" Paco, but instead to "punish[]" his brother by having him "chained up" at a facility in Mexico "in the middle of nowhere."

Undisputed evidence also shows Manny paid the two men who abducted Paco. Although Manny claimed he had nothing to do with his brother's abduction, including recommending the Tijuana facility, Manny paid the men $3,000 two days later because the men were "calling" and "harassing" *him*. That the two men who beat and forcefully sedated Paco believed Manny was financially responsible for their actions supports the inference Manny participated in the conspiracy.

In addition, Manny told family members about Paco's purported drug use before and while Paco was being held in Ensenada. For example, a few days before Paco's abduction, Manny told Rebecca her husband was using cocaine, heroin, and methamphetamine. And after, he told Paco's children that Paco was using cocaine and methamphetamine and to watch out for "needles" at the Company, suggesting Paco used drugs at work. A reasonable inference to be drawn from this evidence is that Manny also told Manuel Sr. about Paco's alleged drug use, and that information is why Manuel Sr. amended his Trust to leave Manny with a majority interest in the Company.

Indeed, the timing of Manuel Sr.'s amendment to his Trust, which allowed Manny to oust his brother from further involvement in what for decades had been a family business run by the two brothers, further supports the inference of Manny's participation in the plan. Up until 2018, the two brothers each enjoyed an equal minority interest in the Company. And as of late June 2018, the Trust provided Paco and Manny would be equal

50 percent owners upon Manuel Sr.'s passing. Yet just two days after Paco's August 15 abduction, Manuel Sr. made a final amendment to his Trust to leave Manny as majority owner of the Company. There is evidence the two brothers often "butt[ed] heads" over how to run the Company, as "they had two different views on how to do things, and so there was a lot of disagreement" between them. With Paco then locked up in Ensenada for about three months and Manuel Sr. seriously ill, Manny assumed control of the Company. The timing of Manuel Sr.'s final amendment to the Trust is thus further circumstantial evidence of Manny's involvement in the conspiracy against his brother. (See *Applied Equipment Corp.*, 7 Cal.4th at pp. 510–511; *AREI II Cases,* 216 Cal.App.4th at p. 1022.)

Manny, however, told the jury a very different story at trial, one that he repeats on appeal. He claims the evidence is "undisputed" the two men entered Paco's home with Rebecca's "consent" and she "assist[ed]" the men in getting her sedated husband into Mangas' car. Manny also claims the "evidence clearly established" Rebecca and Cristina conspired with Mangas and the two men to have Paco abducted and taken to Mexico against his will, out of concern he was abusing drugs, and that no evidence linked Manny to their conspiracy.

Manny's claims are simply a request for us to reweigh the evidence and make new findings favorable to him. This is not our role as an appellate court; our power "begins and ends" with a determination whether, contradicted or uncontradicted, substantial evidence supports the jury's findings. (*Crawford*, 3 Cal.2d at p. 429.) In making this determination, we defer to the fact finder's credibility determinations. (*Leff*, 33 Cal.3d at p. 518.)

Summarizing the evidence in the light most favorable to the jury's findings (see *Crawford*, 3 Cal.2d at p. 429), we conclude substantial evidence supports the finding that Manny participated in the conspiracy to commit assault, battery, and false imprisonment against Paco.

### III.

We affirm the judgment.  Paco is entitled to recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

CASTILLO, J.

WE CONCUR:

IRION, Acting P. J.

DO, J.

14