Filed 9/24/13  Premium Stones Trading v. AMS Stones Warehouse CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PREMIUM STONES TRADING CORPORATION,<br><br>     Plaintiff, Cross-Defendant, and Respondent,<br><br>     v.<br><br>AMS STONES WAREHOUSE, INC.,<br><br>     Defendant, Cross-complainant, and Appellant,<br><br>CARLA MCEWEN,<br><br>     Defendant and Appellant. | D061619<br><br><br>(Super. Ct. No. 37-2010-00099871-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel M. Pressman, Judge.  Affirmed in part, reversed in part, remanded with directions.

Fasel & Fasel, Frank R. Fasel; Law Offices of Yasmine Djawadian and Yasmine Djawadian for Defendants and Appellants.

No appearance for Plaintiff and Respondent.

AMS Stones Warehouse, Inc. (AMS) and Carla McEwen (McEwen) appeal from a judgment following a bench trial wherein the trial court found in favor of Premium Stones Trading Corporation (Premium Stones), awarding Premium Stones $119,191.62 plus $44,970.38 in interest for a breach of oral contract, among other claims, as well as $7,500 for passing dishonored checks. The judgment also included the trial court's finding that McEwen was the alter ego of AMS.

AMS and McEwen contend that substantial evidence does not support the court's judgment. We agree that substantial evidence does not support the court's finding in favor of Premium Stones on the claim for account stated or the award of treble damages for the dishonored checks, and we reverse the judgment as to these two claims. In all other respects, we affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

AMS and McEwen's primary contention on appeal is that substantial evidence does not support the judgment following a bench trial. However, they fail to provide us with any semblance of the evidence admitted at trial to support the trial court's judgment, which is essential for a substantial evidence review. (See *Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023, 1043 (*Ortega*).) The "Statement of Facts" section of the opening brief merely presents on overview of the procedural history of the dispute as well as a cursory explanation of the witnesses at trial. AMS and McEwen do not supply us with the relevant facts based on the evidence admitted at trial. Instead, they merely present us with "evidence" and argument that support only their position. This is improper and inappropriate, especially when AMS and McEwen have

2

submitted the only brief in this matter. We therefore have provided a factual and procedural history of this matter based on the record with minimal guidance from the opening brief.

## The Operative Pleadings

Premium Stones brought suit against AMS, McEwen, Faber Stone, LLC (Faber), FBR Marble, Inc. (FBR), and Hikmet Aksel (Aksel) (AMS, McEwen, Faber, FBR, and Aksel collectively referred to as Defendants) for breach of oral contract, goods sold and delivered, open book account, account stated, and claim on dishonored checks. The gravamen of the complaint involved Premium Stones's contention that AMS failed to pay it pursuant to an oral consignment agreement. Premium Stones also alleged McEwen, Faber, FBR, and Aksel were all alter egos of AMS.

AMS brought a cross-complaint against Premium Stones, Mauro Pitanga (Mauro), and Claudia Pitanga (Claudia) for breach of contract, negligent misrepresentation, intentional misrepresentation, accounting of joint venture, quantum meruit, and promissory estoppel. AMS's primary contention was that it entered into a joint venture with Premium Stones and Premium Stones breached that agreement by failing to infuse cash into the joint venture and taking more than one-third of the profits of the joint venture. AMS also claimed Mauro and Claudia were employees of Premium Stones, who acted on the company's behalf.

The claims in both the operative complaint and the cross-complaint were tried in a bench trial.

3

Premium Stones's Case

Mauro is president of Premium Stones. Premium Stones's business consists of exporting granite from Brazil and selling it on consignment. Premium Stones's typical consignment agreement involves providing a retailer with granite, and the retailer selling the granite to the consumer and paying Premium Stones its costs plus 50 percent of the profit.

Premium Stones started operating in 2007. At that time, it was incorporated in Florida under the name Premium Stones Corporation. However, Premium Stones Corporation's accountant, Derek Nakagawa (Nakagawa), advised Mauro to move the company to California because all of the company's business was there. Premium Stones moved to California and was incorporated under the name "Premium Stones Trading Corporation" in 2008. Mauro added "Trading" to the company's name to make it "a little bit different" and to better represent its style of business. When Premium Stones moved to California, Nakagawa transferred all of Premium Stones Corporation's assets, debts, and liabilities to Premium Stones. Premium Stones continued to serve the same clients as Premium Stones Corporation and operated under previously existing consignment agreements entered into by Premium Stones Corporation.

In early 2007, Mauro's friend introduced him to McEwen. McEwen was the owner of Brazil Stones located at 7988 Miramar Road in San Diego. The physical location of Brazil Stones consisted of a spacious yard with "slabs" of material like granite as well as a large doublewide trailer containing an office, kitchen, and bathroom.

Premium Stones and Brazil Stones entered into a written consignment agreement (the Written Agreement).[1] Under the Written Agreement, McEwen selected the granite she wanted from Premium Stones based on the granite Premium Stones had available at that time. Premium Stones then delivered the selected granite to Brazil Stones. Upon delivery, McEwen inspected the granite to ensure that she received what she ordered and provided Premium Stones with confirmation that she had received the material ordered. Mauro informed McEwen of the cost of the granite. Brazil Stones then sold the granite and paid Premium Stones the cost plus 50 percent of the profit after the sale. Mauro returned to Brazil Stones's warehouse every 15 days or so to check on the amount of granite sold. McEwen sometimes provided Mauro with written confirmation of what was sold and for what price, and at other times, McEwen informed Mauro verbally of the sales.

Shortly after Premium Stones and Brazil Stones began doing business, Brazil Stones changed its name to AMS. Mauro visited Brazil Stones's yard at 7988 Miramar Road and saw that the yard contained a sign indicating that the company was now called AMS. Brazil Stones did not provide any written notice to Premium Stones that it was changing its name nor did it ask Premium Stones to remove any of its unsold granite. Mauro noticed that the employees were the same at AMS as they were at Brazil Stones. McEwen told Mauro that she changed Brazil Stones's name to AMS because Brazil Stones had owed "a bunch of people" money. However, she explained to Mauro that

---

[1] Although the Written Agreement was a trial exhibit that was admitted into evidence, AMS and McEwen did not include it in their appellant's appendix.

AMS and Brazil Stones were the same company and AMS would continue to sell Premium Stones's granite. McEwen also informed Mauro that AMS was her company and she would continue to operate like nothing had changed.

When Brazil Stones changed its name to AMS, McEwen began working with Aksel. Aksel was McEwen's partner and had an ownership interest in AMS. He also had an ownership interest in Faber and FBR, both of which operated similar businesses to AMS.[2] Mauro met Aksel when he learned that Brazil Stones had changed its name to AMS.

At some point, AMS experienced financial difficulties and fell behind on its payments to Premium Stones. Premium Stones maintained an account statement that showed invoices, relating to granite provided to AMS, which had been paid or partially paid. The account statement illustrated that Premium Stones had billed AMS a total of $230,237.22 and had an open balance of $119,191.62. The account statement was created by Nakagawa using a computer accounting system called QuickBooks. Nakagawa created the account statement for AMS in his usual course of business by inputting information regarding the purchases of inventory, customer sales, deposits to the bank, and payment of bills based on information provided to him, such as bills of lading, invoices, and purchase orders.

During the course of their business relationship, AMS provided Premium Stones with four checks that were returned for insufficient funds. The first check, numbered

---

[2]    Premium Stones unsuccessfully sued Faber and FBR as alter egos of AMS; thus, we do not include any substantive discussion of Faber or FBR.

1230, was made payable to Premium Stones in the amount of $6,500 and was dated February 25, 2008. On the face of that check was a stamp stating: "Return Reason - A Not Sufficient Funds." The second check, numbered 2077, was made payable to Premium Stones in the amount of $3,000 and was dated June 20, 2008. On the face of that check was a stamp providing: "Return Reason - S Refer to Maker." The third check, numbered 2085, was made payable to Premium Stones in the amount of $6,112.71 and was dated June 27, 2008. On the face of that check was a stamp avowing: "Return Reason - A Not Sufficient Funds." The fourth check, numbered 1038, was made payable to AMS in the amount of $800 and dated September 2008 (the day was illegible). On the face of that check was a stamp affirming: "Return Reason - C Stop Payment." Premium Stones provided additional evidence that it did not receive funds to cover any of the returned checks.

McEwen also wrote a check, numbered 1045, on her personal account made payable to Premium Stones in the amount of $4,000 and was dated July 8, 2008. The check was returned for insufficient funds and bore the stamp on the face of the check stating: "Return Reason – A Not Sufficient Funds." Premium Stones provided additional evidence that it did not receive funds to cover McEwen's returned check.

McEwen drove one of AMS's company cars, a BMW. She would use an AMS credit card to buy gas. McEwen also used the AMS credit card to purchase: meals at restaurants like Outback Steakhouse, McDonald's, and In-N-Out; supplies and materials from Home Depot; groceries, children's toys, clothing, and veterinary services for McEwen's dog. AMS's bank records also indicated that mortgage payments were made

7

from the account, but AMS did not have a mortgage. McEwen also caused AMS to make a $2,000 payment to the Kabbalah Centre. In addition, AMS's bank records showed that checks were written to McEwen and on McEwen's behalf in relation to real estate transactions that did not involve AMS. Also, McEwen wrote a $5,000 check on behalf of AMS for rent.

Defendants' Case

Defendants challenged Premium Stones's case with four primary theories. First, they argued they never did business with Premium Stones because Premium Stones was incorporated in 2008 after the dispute arose. Instead, Defendants contend they only did business with Premium Stones Corporation, a Florida corporation that no longer existed at the time of the trial. Second, Defendants argued that all of Premium Stones's activities were intended to fraudulently obtain work visas for Mauro and Claudia. The trial court did not allow any evidence on this matter although Defendants tried numerous times to offer such evidence. Therefore, we omit any discussion of this theory. Third, Defendants claimed Premium Stones's employees created purchase orders on AMS's computers; thus, the purchase orders produced at trial were shams and did not originate from AMS. Finally, Defendants claimed that they paid Premium Stones far more money than Premium Stones was seeking in the suit. In other words, there was no open balance.

Aksel handled the "financials" for AMS. Aksel admitted that Premium Stones Corporation and AMS entered into an oral agreement, but characterized the agreement as a joint venture. Aksel described the agreement as requiring Premium Stones Corporation

8

to provide granite to AMS, which AMS would sell and pay Premium Stones Corporation its costs plus one-third of any profits.

Aksel, however, testified that the joint venture agreement never was reduced to writing despite the parties' attempts to do so. In one of the draft agreements that Aksel believed McEwen drafted, the draft agreement made clear that liabilities AMS owed to Premium Stones in the amount of $119,998 would not be paid if the parties agreed to the joint venture. Although Aksel admitted the $119,998 amount came from AMS's QuickBooks system, he testified that its profit and loss statements were unreliable as were some of AMS's inventory and sales reports. In other words, Aksel claimed the $119,998 listed as a liability AMS owed Premium Stones was not accurate.

Aksel testified that when he made payments to Premium Stones, they were not related to any invoice. He simply made payments to Premium Stones by check when Premium Stones requested a check, but the understanding was that Premium Stones would not deposit the check until AMS collected the funds from AMS's customers. Aksel testified that AMS had a record of the total amount of payments made to Premium Stones, but AMS did not produce any such record. Aksel agreed this was true despite the fact that AMS's accounting software (QuickBooks) had the ability to produce such a report.

McEwen testified that she sometimes told people she was an owner of AMS because it was easier to explain than her claim that her mother was an owner and McEwen had power of attorney over her mother's assets. McEwen took the position that she was only AMS's employee. She also testified that all her credit card charges with

9

AMS's credit card were for business purposes. However, McEwen admitted that she used AMS's bank accounts for personal expenses, but she reimbursed those accounts. She provided no documents to support this testimony.

In addition, McEwen explained that the $72,787 of cash withdrawals from AMS's bank account was used to pay employees and vendors. McEwen also claimed she made several payments in cash to Premium Stones, but did not have any documents proving such.

The Trial Court's Findings

After hearing closing arguments, the trial court granted Premium Stones's motion for a nonsuit on the cross-complaint. In granting the motion, the court noted that the "the cross-complainants, in trying to establish the elements of their causes of action lack total credibility that there was any agreement whatsoever."

The trial court asked Premium Stones's counsel to draft a statement of decision and provided the following guidance:

> "My ruling in this case is and will turn on the credibility of the witnesses. [¶] I have listened to the testimony of the Defendants in this case, and I find each of the individuals to be incredible. I have never – well, that's not true, I can't say 'never,' but the testimony of Ms. McEwen is incredible, her conduct inappropriate, he-she. Well, anyway, I have listened to the explanation of the documents which she purported to deny. [¶] The Defendants did not produce any documents other than attack the Plaintiff's documents and say that they were unreal and unreliable. There were no corporate documents expressed. So, in terms of credibility, I have a list that I will be utilizing when we go review the statement of decisions that are proposed. [¶] As to the alter ego allegations. My tentative is this that judgment clearly is against AMS Stones Warehouse, Inc., a California corporation. It is [clear] to me that Carla McEwen is, in fact, and has, in fact used AMS Stones Warehouse Inc. as an alter

10

ego. She's used the corporation as her personal piggy bank. The cash deposits, the cash that's been withdrawn from ATM, the purchases for clothes, food, all were for personal purposes, all by someone who had the unfettered access to the accounts and she used those freely. And I've gone through the analysis and the criteria and I think that if there was any case that has met the alter ego criteria, Ms. McEwen meets that criteria with AMS Stones."

Premium Stones submitted a proposed statement of decision. The trial court signed the proposed statement of decision with minor changes not relevant to any of the issues raised here. Defendants filed an objection to the court's statement of decision arguing that Defendants were denied an opportunity to propose a statement of decision or comment on Premium Stones's proposed statement of decision. The court subsequently entered judgment. AMS and McEwen appealed.

DISCUSSION

I

*AMS AND MCEWEN'S CONTENTIONS*

AMS and McEwen contend that substantial evidence does not support the judgment. Specifically, they maintain: (1) the evidence showed Premium Stones lacked standing to sue and (2) the evidence was insufficient to show a breach of oral agreement, a cause of action for goods sold and delivered, a claim for open book account, a cause of action for account stated, a claim on dishonored checks, and that McEwen was AMS's alter ego.

A. Standard of Review

"In reviewing the sufficiency of evidence on appeal, we resolve all conflicts in favor of the prevailing party and we indulge all legitimate and reasonable inferences to

11

uphold the verdict if possible. 'It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. . . .' [Citation.]" (*Ortega*, *supra*, 64 Cal.App.4th at p. 1043.) Our review is not limited to appraising " 'isolated bits of evidence selected by the [appellant].' " (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873.) We are required to accept all evidence which supports the successful party, disregard the contrary evidence, and draw all reasonable inferences to uphold the verdict. (*Minelian v. Manzella* (1989) 215 Cal.App.3d 457, 463.) Thus, it is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 766; see *Leff v. Gunter* (1983) 33 Cal.3d 508, 518 (*Leff*).) Credibility is an issue of fact for the finder of fact to resolve (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622), and the testimony of a single witness, even that of a party, is sufficient to provide substantial evidence to support a finding of fact (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614). "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652.) Because Premium Stones was the prevailing party at trial, we review the evidence in a light most favorable to it. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 787.)

12

Although AMS and McEwen raise a substantial evidence challenge, they fail to cite appropriately to the record to mount such a challenge. They do not provide us with the evidence that ostensibly supports the judgment and explain how this evidence ultimately falls short in supporting the judgment. Instead, AMS and McEwen focus on evidence they provided during trial. However, the trial court determined that their evidence, especially Aksel's and McEwen's testimony, was unbelievable. We cannot reweigh the evidence as AMS and McEwen impliedly urge us to do. (See *Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465.)

### B. Premium Stones's Standing

AMS and McEwen contend that Premium Stones lacks standing to sue. They argue that any business AMS conducted was with Premium Stones Corporation, a Florida corporation, that was "dissolved at all times during said litigation." As such, AMS and McEwen contend that Premium Stones Corporation was the real party in interest, and Premium Stones, a California corporation, was not the proper plaintiff. We are not persuaded.

Mauro testified that, on Nakagawa's suggestion, he moved Premium Stones Corporation from Florida to California. All of Premium Stones Corporation's business was in California. He renamed the entity Premium Stones Trading Corporation. When Premium Stones Corporation moved to California, Mauro, through Nakagawa, transferred all its assets, debts, and liabilities to Premium Stones. The new Premium Stones continued to serve the same clients as the former Premium Stones Corporation

13

and operated under previously existing consignment agreements entered into by Premium Stones Corporation.

Further, it was apparent that Aksel and McEwen were aware that Premium Stones Corporation was operating as Premium Stones. They tried to negotiate a joint venture agreement between Premium Stones and AMS. Indeed, AMS cross-complained against Premium Stones for breach of an alleged joint venture agreement.

In short, substantial evidence shows that Premium Stones Corporation moved to California, changed its name and continued to do business with the same customers as before. And Aksel and McEwen drew no distinction between Premium Stones Corporation and Premium Stones in their business dealings, except that they attempted to negotiate a joint venture with Premium Stones only.

AMS and McEwen contend, even if we determine Premium Stones assumed all the liabilities and assets of Premium Stones Corporation, Premium Stones still lacked standing to sue on behalf of Premium Stones Corporation. (See *J.C. Peacock, Inc. v. Hasko* (1960) 184 Cal.App.2d 142, 150-152 (*J.C. Peacock*).) AMS and McEwen's reliance on *J.C. Peacock* is misplaced.

In *J.C. Peacock*, *supra*, 184 Cal.App.2d 142, the Court of Appeal determined that the plaintiff, the surviving postmerger corporation, could not initiate a lawsuit in the name of the merged out corporation. Having done so in the name of a corporation that no longer existed, the plaintiff "was not entitled to the extraordinary and summary proceeding of attachment." (*Id*. at p. 152.) Here, Premium Stones did not bring suit in the name of a nonexistent corporation. In contrast, Premium Stones was abundantly clear

14

during its case-in-chief, consistent with its complaint, that it was pursuing damages based on its business relationship with AMS, not Premium Stones Corporation's relationship with AMS.  Unlike the plaintiff in *J.C. Peacock*, Premium Stones did not file numerous complaints in the name of a merged out corporation while consistently representing to the court that the merged out company still legally existed.  Premium Stones proceeded with the instant action at all times as Premium Stones.  It never represented to the court that Premium Stones Corporation was the proper plaintiff.  In addition, Premium Stones was an incorporated California corporation prior to filing suit.  *J.C. Peacock* therefore is not instructive here.  Premium Stones had standing.

### C.  Breach of Oral Contract and Common Counts

AMS and McEwen next contend that substantial evidence does not support the trial court's finding in favor of Premium Stones on its causes of action for breach of oral contract, goods sold and delivered, and open book account.  We disagree.

To state a cause of action for breach of contract, a party must plead the existence of a contract, his or her performance of the contract or excuse for nonperformance, the defendant's breach, and resulting damage.  (*Harris v. Rudin, Richman & Appel* (1999) 74 Cal.App.4th 299, 307.)  Here, Premium Stones offered sufficient evidence to establish each of these elements.

Premium Stones Corporation and Brazil Stones entered into a written consignment contract whereby Premium Stones Corporation would provide Brazil Stones with slabs of granite, and after Brazil Stones sold the slabs, it would pay Premium Stones Corporation its costs plus half the profits.  When Brazil Stones changed its name to AMS, McEwen,

15

on behalf of AMS, confirmed that AMS would continue to do business with Premium Stones Corporation under the terms of the written agreement. Premiums Stones Corporation subsequently changed its name to Premium Stones Trading Corporation and continued to do business with AMS.

AMS and McEwen argue there was no contract because Premium Stones did not prove a "meeting of the minds": there was a disagreement between the parties regarding the amount AMS would pay Premiums Stones. "Evidence" of this disagreement is found in the testimony of Aksel and McEwen. The court, however, determined their respective testimony was unreliable. The court believed Mauro's testimony that McEwen agreed to an oral contract according to the terms testified to by Mauro. One witness's testimony can establish substantial evidence. (See *In re Marriage of Mix*, *supra*, 14 Cal.3d at p. 614.) Despite the urging of AMS and McEwen, we cannot reevaluate witness credibility or reweigh evidence on appeal. (*Leff*, *supra*, 33 Cal.3d at p. 518.)

We also are satisfied that substantial evidence shows Premium Stones proved its performance under the oral contract. It offered Mauro's testimony regarding the delivery of slabs of granite to AMS as well as purchase orders from AMS confirming the granite received, Premium Stones's invoices, and other documentary evidence showing that Premium Stones delivered granite slabs to AMS. McEwen's and AMS's challenge goes to the weight of the evidence considered by the trial court. They argue that AMS did not

16

create the purchase orders, some of the documents were illegible,[3] and other documents were unreliable. It bears repeating that we do not reweigh the evidence on appeal. (*Leff*, *supra*, 33 Cal.3d at p. 518.)

In addition, there was substantial evidence that AMS breached the oral contract and Premium Stones was damaged. Premium Stones offered an account statement showing an unpaid balance of $119,191.62. This amount was close to the amount of liability AMS owed Premium Stones as set forth in a document created by McEwen based on AMS's records. Further, Premium Stones provided evidence through Nakawaga's testimony regarding the creation of the account statement and how the outstanding balance was calculated.

AMS and McEwen challenge the account statement, arguing that it contained the date "August 1, 2011" and time "6:11 p.m." on the top left corner indicating it was made "nearly eleven months after the lawsuit was filed." However, this is an argument that needed to be made to the trial court. AMS and McEwen had the opportunity to probe this issue during the cross-examination of Mauro and Nakagawa. They did not sufficiently do so, and there is nothing in the record supporting their argument now. Perhaps, the date and time stamp on the document indicate when that spreadsheet was printed. Maybe the date and time stamp are incorrect. On this record, we do not know. As such, we accept

---

3     There only appears to have been one document admitted into evidence where Defendants objected that it was illegible, but the court admitted only the first page of the document, which was legible.

the trial court's reliance on the account statement and consider it substantial evidence of the amount AMS owed Premium Stones.

Like Premium Stones's claim for breach of oral contract, we are satisfied that substantial evidence supports the trial court's finding in favor of Premium Stones on its causes of action for goods sold and delivered and open book.  These claims are common counts.  (4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 553, p. 680.)  "The only essential [elements] of a common count are '(1) the statement of indebtedness in a certain sum, (2) the consideration, i.e., goods sold, work done, etc., and (3) nonpayment.' [Citation.]"  (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 460.)  Here, the same evidence that supports Premium Stones's claim for breach of oral contract supports these common counts.

In summary, substantial evidence supports the trial court's findings in favor of Premium Stones that it proved its claims for breach of oral contract, goods sold and delivered, and open book.

### D.  Account Stated

"The essential elements of an account stated are:  (1) previous transactions between the parties establishing a relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by the debtor, express or implied, to pay the amount due."  (*Zinn v. Fred R. Bright Co.* (1969) 271 Cal.App.2d 597, 600.)  AMS and McEwen assert that the evidence does support the second element of this cause of action.  We agree.

18

There is nothing in the record indicating an agreement between the parties that AMS would pay Premium Stones a set amount. Although Premium Stones's spreadsheet and AMS's own documents indicate amounts owed that are close to the same number, they do not match. No other evidence offered at trial shows that the parties agreed on the exact amount AMS owed Premium Stones. Thus, substantial evidence does not support the trial court's finding that Premium Stones proved its cause of action for account stated.

## E.  The Dishonored Checks

Premium Stones brought claims based on five dishonored checks. Although we are satisfied that Premium Stones proved that each check was returned for insufficient funds, we agree with AMS and McEwen that Premium Stones was not entitled to treble damages under Civil Code section 1719, subdivision (a)(2). That subdivision allows the payee to recover treble damages capped at $1,500 if the payee sends written demand by certified mail to the person who passed the check advising him or her that if he or she does not pay the amount of the check within 30 days from the date of the written demand, he or she could be liable for treble damages. (Civ. Code, § 1719, subd. (a)(2).)

There is nothing in the record indicating that Premium Stones proved that they made the required mailings. We note that copies of what purports to be the required mailings are attached to Premium Stones's complaint, but neither letter was admitted at

19

trial.  Without proof of the mailings, Premium Stones was not entitled to treble damages and the judgment as to the award of treble damages must be reversed.[4]

### F.  Alter Ego

The trial court found that McEwen was the alter ego of AMS.  McEwen challenges this finding, arguing it is not supported by substantial evidence.  Specifically, McEwen argues that there was no evidence that she was anything more than an employee of AMS.  She also contends that, even if she was an owner of AMS, there was no evidence supporting any of the factors warranting an alter ego finding.  We disagree.

A corporation is ordinarily regarded as a legal entity, separate and distinct from its shareholders, officers, and directors.  (*Sonora Diamond Corp. v. Superior Court* ( 2000) 83 Cal.App.4th 523, 538 (*Sonora*).)  Nonetheless, a corporate identity may be disregarded "where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation."  (*Ibid*.)  Alter ego liability affords relief when "some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form."  (*Id*. at p. 539.)

---

[4]    AMS and McEwen insist that Premium Stones was awarded damages equaling the entire open balance, which included the amount of the returned checks.  AMS and McEwen therefore argue that any damages awarded for the dishonored checks are improper "double" damages.  We disagree.  The judgment does not award Premium Stones both the amount of the open book in addition to the amount of the checks.  Instead, in regard to the dishonored checks, the court awarded Premium Stones treble damages under Civil Code section 1719, subdivision (a)(2) only.  These damages are in addition to the amount of the checks, which the court did not award Premium Stones in addition to the damages for the open book.  The treble damages would have been proper if Premium Stones had proven the required mailing occurred.

20

Two conditions must be met to find alter ego liability: (1) "[T]here must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist"; and (2) if the acts in question are treated as those of only the corporation, the result will be inequitable. (*Sonora*, *supra*, 83 Cal.App.4th at p. 538.)

Among the factors to be considered in applying the alter ego doctrine are (1) commingling of funds and other assets, (2) the holding out by one entity that it is liable for the debts of the other, (3) identical equitable ownership in the two entities, (4) use of the same offices and employees, (5) use of one entity as a mere shell or conduit for the affairs of the other, (6) inadequate capitalization, (7) disregard of corporate formalities, (8) lack of segregation of corporate records, and (9) identical directors and officers. (*Sonora*, *supra*, 83 Cal.App.4th at pp. 538-539.) "No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied." (*Id.* at p. 539.) The trial court's alter ego finding is reviewed for substantial evidence. (*Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 837.)

McEwen's first argument challenging the court's finding that she is an alter ego of AMS rests on a faulty premise: there was no evidence that McEwen was anything more than an employee of AMS. This is untrue. The only evidence presented at trial that McEwen was an employee came from the testimony of Aksel and McEwen. The court found such testimony unbelievable.

21

To the contrary, Premium Stones presented substantial evidence supporting the conclusion that McEwen was an owner of AMS. Mauro testified that McEwen told him she was an owner. McEwen had a company credit card, signed company checks, withdrew money out of AMS's bank account, and attempted to make a payment from her personal account on behalf of AMS. When Premium Stones and AMS were negotiating a joint venture, McEwen was a signatory on all the draft documents and mentioned by name in the documents. McEwen even admitted that she told people she was an owner of AMS.

Further, we are satisfied that substantial evidence supports a unity of interest and ownership between AMS and McEwen that the separate personalities of AMS and McEwen do not in reality exist. In addition to the evidence offered to show McEwen was an owner of AMS, Premium Stones presented evidence that (1) McEwen used the AMS credit card to buy personal items, such as clothing, groceries, and meals; (2) AMS's funds were used to make mortgage payments for property not owned by AMS and Aksel had no knowledge of those payments; and (3) McEwen withdrew cash from AMS's bank account for personal use. Also, the court noted that AMS never produced any corporate documents. Moreover, although asked several times regarding the capitalization of AMS at its creation, none of the witnesses questioned (Aksel and McEwen) were able to provide coherent testimony about its capitalization, warranting the inference that the company was not sufficiently capitalized.

McEwen ignores most of this evidence. For the evidence she does acknowledge, McEwen argues about the weight of the evidence. For example, she claims that Premium

22

Stones did not sufficiently cross-examine her about the credit card charges. Again, this argument goes to the weight of the evidence. Premium Stones raised the question of the credit card charges in its examination of Aksel. McEwen tried to explain away the questionable charges when she was questioned by her attorney, but the trial court did not believe her. In conducting a substantial evidence review, we must accept the fact finder's credibility determinations. (See *Johnson v. Pratt & Whitney Canada, Inc.*, *supra*, 28 Cal.App.4th at p. 622.) As we discuss above, we cannot reweigh the evidence. (*Reichardt v. Hoffman*, *supra*, 52 Cal.App.4th at p. 766.) This is precisely what McEwen asks us to do.

Finally, substantial evidence supports the second prong necessary to invoke alter ego liability. Here, it is apparent that AMS lacked funds. They owed Premium Stones over $100,000. If the court did not find McEwen was the alter ego of AMS, it leads to the possibility that any judgment against AMS would go unsatisfied. While this in itself does not create an inequitable result, under the circumstances here, it is apparent that McEwen's conduct at least partly led to AMS's financial woes. Put differently, a finding of no alter ego liability would sanction McEwen's behavior, which, in the words of the trial court, consisted largely of treating AMS "as her personal piggy bank." The trial court's finding of alter ego liability thus prevented an inequity.

## DISPOSITION

The judgment is reversed as to the claims for account stated and the award of treble damages for the dishonored checks. The judgment is otherwise affirmed. We

23

remand this matter to the trial court for further proceedings consistent with this opinion, if necessary.  The parties shall bear their own costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


HALLER, J.

O'ROURKE, J.