Filed 5/28/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| HARLEY-DAVIDSON, INC. et al., | D064241 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2011-00100846-CU-MC-CTL) |
| FRANCHISE TAX BOARD, | |
| Defendant and Respondent. | |

APPEALS from a judgment of the Superior Court of San Diego County, Joel M. Pressman, Judge.  Affirmed in part and reversed in part.

Silverstein & Pomerantz, Amy L. Silverstein, Edwin P. Antolin, Johanna W. Roberts, Lindsay T. Braunig and Edward J. Beeby for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Paul D. Gifford, Senior Assistant Attorney General, W. Dean Freeman, Leslie Branman Smith and Tim Nader, Deputy Attorneys General, for Defendant and Respondent.

Harley-Davidson, Inc. and several of its subsidiaries (together, Harley-Davidson) sued the Franchise Tax Board (Board) for a tax refund.  The trial court sustained the

Board's demurrer to Harley-Davidson's commerce clause (U.S. Const., art. I, § 8, cl. 3) challenge to Revenue and Taxation Code[1] provisions that allow intrastate unitary businesses to choose annually whether to compute their tax using the combined reporting method or the separate accounting method but require interstate unitary businesses to compute their tax using only the combined reporting method. We conclude the trial court erred in sustaining the demurrer because the statutory scheme facially discriminates on the basis of an interstate element in violation of the commerce clause. We will reverse the judgment in that respect and remand to the trial court to determine in the first instance whether the taxation scheme withstands strict scrutiny—that is, whether it " 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.' " (*Oregon Waste Systems, Inc. v. Department of Environmental Quality of State of Ore.* (1994) 511 U.S. 93, 100-101 (*Oregon Waste*).)

On a separate issue, the trial court determined after a bench trial that two Harley-Davidson subsidiaries were taxable by California during the tax years 2000 through 2002 (Years at Issue). Harley-Davidson contends the trial court erred by finding those subsidiaries bore a sufficient nexus to this state to overcome due process and commerce clause limitations on taxing foreign entities. We disagree and affirm the judgment in this respect.

Because this appeal presents two factually and procedurally distinct issues that are subject to different standards of review, we will address each issue separately.

---

[1]     All unspecified statutory references are to the Revenue and Taxation Code.

DISCUSSION

I.

*THE COMMERCE CLAUSE CHALLENGE TO CALIFORNIA'S STATUTORY
SCHEME FOR COMPUTING TAX LIABILITY*

Harley-Davidson contends the trial court erred by sustaining the Board's demurrer

to its first cause of action, which challenged the constitutionality of California's statutory

scheme for determining the method by which unitary business groups compute their

California tax liability.  Harley-Davidson contends that because the scheme treats

taxpayers differently based solely on their geography, and because that differential

treatment discriminates against interstate commerce by benefiting intrastate businesses at

the expense of interstate businesses, the scheme violates the commerce clause.  We

conclude Harley-Davidson has alleged a commerce cause violation sufficiently to

withstand the Board's demurrer.

A.      *Factual and Procedural Background*[2]

We begin with a brief overview of the relevant taxation scheme.  A unitary

business is an enterprise comprised of a number of commonly owned and controlled

businesses, each of which is dependent on or contributes to the operation of the entire

business enterprise of the group.  (*Edison California Stores v. McColgan* (1947) 30

Cal.2d 472, 481; *Handlery v. Franchise Tax Board* (1972) 26 Cal.App.3d 970, 973

(*Handlery*).)  There are two possible methods for unitary corporate taxpayers to compute

---

[2]      Because this issue arises from the trial court's sustaining of the Board's demurrer,
we must assume the truth of the properly pleaded factual allegations, facts that reasonably
can be inferred from those expressly pleaded, and matters of which judicial notice has
been taken.  (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)

their California tax liability: the separate accounting method and the combined reporting method. "[S]eparate accounting treats each corporate entity discretely for the purpose of determining income tax liability." (*Barclays Bank PLC v. Franchise Tax Bd. of Cal.* (1994) 512 U.S. 298, 305 (*Barclays*).) The combined reporting method aggregates the entire amount of business income of all corporations in the unitary group. (Cal. Franchise Tax Bd., Pub. No. 1061 (2000).)[3]

Taxpayers engaged in a unitary business within and without California—interstate taxpayers—are required to use the combined reporting method. (§ 25101; *Handlery*, *supra*, 26 Cal.App.3d at p. 973 ["In the case of a 'unitary business' the enterprise files a combined report, and the income from its operations within the state is determined by a formula."].) *Handlery* confirmed that taxpayers engaged in a unitary business wholly within California—intrastate taxpayers—were required to use the separate accounting method. (*Handlery*, at p. 985.) In response to *Handlery*, the Legislature in 1980 enacted section 25101.15, which permits intrastate unitary groups to choose between the combined reporting and separate accounting methods.[4] Thus, as the Board summarizes

---

3       We grant Harley-Davidson's unopposed motion requesting that we take judicial notice of certain Board publications and a report commissioned by the National Conference of State Legislatures, Task Force on State & Local Taxation. (*Ordlock v. Franchise Tax Bd.* (2006) 38 Cal.4th 897, 912, fn. 8 [taking judicial notice of Board publications]; *In re Crockett* (2008) 159 Cal.App.4th 751, 762 [taking judicial notice of Council of State Government's Web site].)

4       Section 25101.15 provides as follows: "If the income of two or more taxpayers is derived solely from sources within this state and their business activities are such that if conducted within and without this state a combined report would be required to determine their business income derived from sources within this state, then such

4

in its respondent's brief, "section 25101.15 provide[s] wholly in-state businesses . . . an election to file their returns on either a unitary combined reporting basis, or a separate-entity basis. [¶] Multistate unitary businesses have no corresponding election." (Fn. omitted.)

Harley-Davidson, through various subsidiaries, engages in two business lines: a motorcycle business and a financial services business. For the Years at Issue, Harley-Davidson reported the income of the motorcycle business but not the financial services business, reasoning the latter was not unitary with the former. Following an audit of Harley-Davidson's combined returns, the Board determined the financial services business was, in fact, unitary with the motorcycle business. Consequently, the Board notified Harley-Davidson that it intended to assess additional taxes for the Years at Issue. Harley-Davidson unsuccessfully protested the Board's determination and provisionally paid more than $1.8 million in additional taxes.

Harley-Davidson then sued the Board to recover a refund in the amount of its additional provisional payment. In the first cause of action of its operative first amended verified complaint (complaint), Harley-Davidson alleged the differential treatment afforded to intrastate and interstate unitary businesses regarding the available methods for computing tax liability violates the commerce clause of the United States Constitution because it "confers benefits on intrastate unitary taxpayers that are not available to . . . interstate unitary taxpayers and that operate as burdens on . . . interstate unitary

taxpayers shall be allowed to determine their business income in accordance with Section 25101."

5

taxpayers."  The complaint cited (among others) the following benefits and burdens:

"[t]he option to file on the basis of the separate reporting method allows intrastate unitary

taxpayers . . . the ability to more efficiently use credits and net operating losses, reduced

tax burden, increased administrative ease and lower compliance costs in preparing

returns . . . ."

The Board demurred to the first cause of action and the trial court sustained the

demurrer without leave to amend.  Harley-Davidson timely appealed.

B.     *Standard of Review*

The constitutionality of California's corporate taxation scheme at issue is a

question of law that we review de novo.  (*Cutler v. Franchise Tax Bd.* (2012) 208

Cal.App.4th 1247, 1253 (*Cutler*).)  Additionally, "[o]n review from an order sustaining a

demurrer, 'we examine the complaint de novo to determine whether it alleges facts

sufficient to state a cause of action under any legal theory . . . .' "  (*Committee for Green

Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42.)

C.     *Commerce Clause Overview*

The commerce clause provides that "[t]he Congress shall have Power . . . [¶]  [t]o

regulate Commerce . . . among the several States."  (U.S. Const., art. I, § 8, cl. 3.)

"Though phrased as a grant of regulatory power to Congress, the [c]lause has long been

understood to have a 'negative' aspect that denies the [s]tates the power unjustifiably to

discriminate against or burden the interstate flow of articles of commerce."  (*Oregon

Waste*, *supra*, 511 U.S. at p. 98.)  In this negative, or dormant, aspect, "the [c]ommerce

[c]lause 'prohibits economic protectionism -- that is, "regulatory measures designed to

6

benefit in[-]state economic interests by burdening out-of-state competitors." ' " (*Fulton Corp. v. Faulkner* (1996) 516 U.S. 325, 330 (*Fulton*); *Bacchus Imports v. Dias* (1984) 468 U.S. 263, 268 ["A cardinal rule of [c]ommerce [c]lause jurisprudence is that '[no] [s]tate, consistent with the [c]ommerce [c]lause, may "impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to local business." ' "].)  "This reading effectuates the Framers' purpose to 'prevent a [s]tate from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.' " (*Fulton*, at pp. 330-331.)

"[T]he first step in analyzing any law subject to judicial scrutiny under the negative [c]ommerce [c]lause is to determine whether it 'regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce.' " (*Oregon Waste*, *supra*, 511 U.S. at p. 99.)  In this context, " 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." (*Ibid.*)  "By contrast, nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' " (*Ibid.*)[5]  Whether the "discrimination comes in the form of a deprivation of a

---

[5]     That said, there is no " '*de minimis*' defense to a charge of discriminatory taxation under the [c]ommerce [c]lause." (*Fulton*, *supra*, 516 U.S. at p. 333, fn. 3; *Oregon Waste*, *supra*, 511 U.S. at p. 100, fn. 4 [recognizing that United States Supreme Court precedents "clearly establish that the degree of a differential burden or charge on interstate

generally available tax benefit, rather than a specific penalty on the [interstate] activity itself, is of no moment."  (*Camps Newfound/Owatonna, Inc. v. Town of Harrison* (1997) 520 U.S. 564, 578-579.)

"If a restriction on commerce is discriminatory, it is virtually *per se* invalid," (*Oregon Waste*, *supra*, 511 U.S. at p. 99) unless the "justifications for discriminatory restrictions on commerce pass the 'strictest scrutiny' " (*id*. at p. 101; *South Central Bell Telephone Co. v. Alabama* (1999) 526 U.S. 160, 169 (*South Central Bell*)).  Accordingly, a discriminatory regulation must be invalidated unless its proponent can " 'show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.' "  (*Oregon Waste*, at pp. 100-101.)[6]

D.     *Analysis*

In applying the commerce clause precedents just discussed, we must determine whether (1) the relevant aspect of California's tax scheme treats intrastate and interstate unitary businesses differently, (2) any differential treatment discriminates against interstate commerce either by benefiting intrastate businesses or burdening interstate

commerce 'measures only the *extent* of the discrimination' and 'is of no relevance to the determination whether a [s]tate has discriminated against interstate commerce' "].)

[6]     A discriminatory tax may also withstand commerce clause scrutiny if it is a "compensatory" or "complementary" tax—that is, "a facially discriminatory tax that imposes on interstate commerce the rough equivalent of an identifiable and 'substantially similar' tax on intrastate commerce." (*Oregon Waste*, *supra*, 511 U.S. at pp. 102-103; *Fulton*, *supra*, 516 U.S. at p. 331 ["a facially discriminatory tax may still survive [c]ommerce [c]lause scrutiny if it is . . . 'designed simply to make interstate commerce bear a burden already borne by intrastate commerce' "].)  The Board does not contend this exception applies.

businesses, and (3) any discriminatory differential treatment withstands strict scrutiny. (*Oregon Waste*, *supra*, 511 U.S. at pp. 99-101.)

1.     *Differential Treatment*

The Board effectively concedes in its briefing that the differential-treatment prong is satisfied, acknowledging that "section 25101.15 provides[s] wholly in-state businesses . . . an election to file their returns on either a unitary combined reporting basis, or a separate-entity basis," while "[m]ultistate unitary businesses have no corresponding election."

2.     *Discrimination*

Many federal, California, and out-of-state cases have concluded that analogous regulatory and tax schemes impermissibly discriminate against interstate commerce. In *Fulton*, the United States Supreme Court examined North Carolina's " 'intangibles tax,' " which imposed a .25 percent tax on the fair market value of corporate stock owned by North Carolina taxpayers. (*Fulton, supra*, 516 U.S. at p. 327.) The offending portion of the tax scheme was a corresponding "taxable percentage deduction equal to the fraction of the issuing corporation's income subject to tax in North Carolina." (*Id.* at pp. 327-328.) "Thus, a corporation doing all of its business within the [s]tate would pay corporate income tax on 100[ percent] of its income, and the taxable percentage deduction allowed to resident owners of that corporation's stock under the intangibles tax would likewise be 100[ percent]. Stock in a corporation doing no business in North Carolina, on the other hand, would be taxable on 100[ percent] of its value." (*Id.* at p. 328.) This differential

9

treatment led the court to conclude "[t]here is no doubt that the intangibles tax facially discriminates against interstate commerce." (*Id*. at p. 333.)

In *South Central Bell*, the United States Supreme Court invalidated Alabama's franchise tax scheme, which allowed domestic corporations to pay a franchise tax based on the par value of the firm's stock—a value the firm could set well below its book or market value—but required foreign corporations to base their tax on " 'the actual amount of capital employed' in Alabama." (*South Central Bell*, *supra*, 526 U.S. 160 at pp. 162, 169.) It was undisputed that although domestic corporations paid tax at a rate of 1 percent of par value while foreign corporations paid at a rate of only .3 percent of their actual capital, domestic corporations paid, on average, only one-fifth the amount they would have paid if they had been taxed as foreign corporations. (*Id*. at pp. 162, 169.) The court concluded that "giv[ing] domestic corporations the ability to reduce their franchise tax liability simply by reducing the par value of their stock, while [denying] foreign corporations that same ability," constituted discrimination under the commerce clause. (*Id*. at p. 169.)

Turning to California authorities, in *Cutler*, the Court of Appeal invalidated section 18152.5, which allowed "an individual California taxpayer to defer capital gains on the sale of stock in a qualified small business if the taxpayer used the gain to purchase stock in another qualified small business. The deferral was available, however, only if the stock sold and purchased was issued by corporations that used 80 percent of their assets in the conduct of business in California and that maintained 80 percent of their payrolls in California." (*Cutler, supra*, 208 Cal.App.4th at p. 1250.) The court stated it

was bound by *Fulton*, *supra*, 516 U.S. at page 330 to "conclude that, because the statute affords taxpayers a deferral for income received from the sale of stock in corporations maintaining assets and payroll in California, while no deferral is afforded for income from the sale of stock in corporations that maintain assets and payroll elsewhere, the deferral provision discriminates on its face on the basis of an interstate element in violation of the commerce clause." (*Cutler*, at p. 1250.)

In *Ceridian Corp. v. Franchise Tax Bd.* (2000) 85 Cal.App.4th 875 (*Ceridian*), the Court of Appeal invalidated former section 24410, which provided a corporate tax deduction for dividends paid to the corporation from the corporation's insurance company subsidiaries because the deduction was limited to dividends paid from income from California sources. (*Ceridian,* at p. 883.) In considering the discriminatory effect of the statute, the court observed: "a statutory scheme . . . that disallows a deduction based on the amount of *property and employees* that the dividend-declaring insurer has in another state, favors domestic corporations over their foreign competitors in raising capital among California corporations, and tends, at least, to discourage domestic corporations from plying their trade in interstate commerce, from purchasing property or hiring employees in other states, and from purchasing subsidiary insurance corporations that do so." (*Id*. at p. 887.) Thus, the court concluded the geographic limitation on the dividend deduction was "unquestionably discriminatory on its face." (*Ibid*.)

In *Farmer Bros. Co. v. Franchise Tax Bd.* (2003) 108 Cal.App.4th 976, the Court of Appeal examined former section 24402, which "afford[ed] to a corporate taxpayer an income tax deduction for a portion of the dividends it receives from another corporation

11

when the dividends are declared from income which was included in the payer corporation's measure of California franchise tax, alternative minimum tax, or corporation income tax." (*Farmer Bros. Co.,* at p. 980.) Following *Ceridian*, the court "conclude[d] that section 24402 is discriminatory on its face because it affords to taxpayers a deduction for dividends received from corporations subject to tax in California, while no deduction is afforded for dividends received from corporations not subject to tax in California. As a result, the dividends received deduction scheme favors dividend-paying corporations doing business in California and paying California taxes over dividend-paying corporations which do not do business in California and pay no taxes in California. The deduction thus discriminates between transactions on the basis of an interstate element, which is facially discriminatory under the commerce clause." (*Farmer Bros. Co.,* at pp. 986-987.)

Harley-Davidson directs us to *General Motors Corp. v. Director of Revenue* (Mo. 1998) 981 S.W.2d 561 (*General Motors*), a decision in which the Supreme Court of Missouri concluded a Missouri tax scheme similar to the one before us impermissibly discriminated against interstate commerce. The statute at issue in *General Motors* allowed affiliated groups of corporations to file a consolidated state income tax return only if 50 percent or more of its income was derived from sources within Missouri. (*Id.* at p. 563.) It was undisputed in *General Motors* that allowing an affiliated group to file a consolidated state tax return could result in tax and administrative benefits for the group. (*Ibid.*) Based on many of the same United States Supreme Court precedents discussed above, the Missouri court concluded that because the benefits of filing a consolidated tax

12

return were only available to "business groups that perform the majority of their business activities in Missouri" (*ibid*.), the statute's 50-percent threshold "facially discriminates against interstate commerce" (*id*. at pp. 565-566).

A reading of the foregoing cases leads to the unavoidable conclusion that California's statutory scheme for determining how unitary businesses compute their California tax liability "discriminates on its face on the basis of an interstate element in violation of the commerce clause." (*Cutler*, *supra*, 208 Cal.App.4th at p. 1250.) That is, whether a unitary business computes its California tax liability using the separate accounting method or the combined reporting method is determined solely by where the unitary business engages in commerce.

We find the Board's attempts to distinguish the commerce clause precedents unpersuasive. For example, whether a statute imposes a 50-percent (as in *General Motors*), 80-percent (as in *Cutler*), or 100-percent (as here) in-state commerce threshold does not determine *whether* a tax scheme discriminates—it only determines *how much* it discriminates. (*Oregon Waste*, *supra*, 511 U.S. at p. 99, fn. 4 ["the degree of a differential burden or charge on interstate commerce 'measures only the *extent* of the discrimination' and 'is of no relevance to the determination whether a [s]tate has discriminated against interstate commerce' "].) Nor does the Board cite any authority that would support the proposition that the commerce clause can only invalidate a single statute or deduction and not "California's entire *tax scheme* of requiring multistate unitary businesses to use combined reports." Indeed, we question the wisdom of a rule that

13

would allow a state to circumvent the commerce clause simply by accomplishing with two statutes what it otherwise could have accomplished with one.

The Board also argues this case is controlled by a different line of authorities that has upheld California's method of apportioning unitary interstate businesses' California tax liability. Those cases arise from the premise that "[u]nder both the [d]ue [p]rocess and the [c]ommerce [c]lauses of the Constitution, a [s]tate may not, when imposing an income-based tax, 'tax value earned outside its borders.' " (*Container Corp. v. Franchise Tax Bd.* (1983) 463 U.S. 159, 164; *Barclays*, *supra*, 512 U.S. 298.) However, those cases are not controlling—or relevant—because they only considered the constitutionality of California's apportionment scheme in isolation, not in the context of differential treatment. (*Westinghouse Electric Corp. v. Tully* (1984) 466 U.S. 388, 399 [" 'Fairly apportioned' and 'nondiscriminatory' are not synonymous terms."]; *General Motors*, *supra*, 981 S.W.2d at p. 567 ["A determination that a state's method of apportionment is constitutionally sound does not foreclose a determination of whether the state's tax scheme discriminates against interstate commerce."]; *Ceridian*, *supra*, 85 Cal.App.4th at p. 884 ["none of the cases cited by the Board concerned a commerce clause challenge"].) Ultimately, the Board concedes the inapplicability of this alternate line of cases when it acknowledges in its briefing that "neither the Supreme Court of the United States nor the Supreme Court of California have explicitly addressed the question of whether requiring multistate businesses to file by combined report/formula apportionment, while allowing in-state businesses to file on separate entity returns discriminates in violation of the commerce clause . . . ."

14

The Board also argues that any differential treatment is not discriminatory because it neither benefits intrastate businesses nor burdens interstate ones.[7] We must reject this argument, however, because Harley-Davidson's complaint alleges the existence of those benefits and burdens and we accept that allegation as true in the context of reviewing an order sustaining a demurrer.[8] (*Schifando v. City of Los Angeles*, *supra*, 31 Cal.4th at p. 1081.)

The Board attempts to rationalize the taxation scheme's discriminatory treatment of interstate businesses by characterizing it as an attempt to "level the field" between intrastate and interstate businesses. As mentioned above, intrastate unitary businesses historically were limited to use of the separate accounting method, which they contended put them at a disadvantage vis-á-vis interstate unitary businesses that used combined reporting. According to the Board, all that section 25101.15 did was eliminate that disadvantage by giving intrastate businesses the option of also using combined reporting. But by giving intrastate businesses the right to choose between two methods while restricting interstate unitary businesses to one, section 25101.15 tipped the playing field—at least superficially—in favor of intrastate businesses. In any event, this argument is unavailing because the state's intent, no matter how noble, cannot justify a

---

[7]     Indeed, the Board goes one step further by suggesting "[a]ny . . . differential treatment is actually *reduced* by section 25101.15 because every time an in-state business opts to use it, that business is treated the same as a multistate business and is required to file utilizing the unitary combined report method."

[8]     In addition, Harley-Davidson's opening brief elaborates on certain of the benefits and burdens alleged in the complaint and provides at least two detailed examples.

15

commerce clause violation. (*Oregon Waste*, *supra*, 511 U.S. at p. 100 ["the purpose of, or justification for, a law has no bearing on whether it is facially discriminatory"]; *Ceridian*, *supra*, 85 Cal.App.4th at p. 886 ["The fact that the tax scheme may serve some other laudatory purpose does not save it from a commerce clause challenge."].)

In summary, Harley-Davidson has sufficiently alleged for purposes of surviving the Board's demurrer that the differential treatment of intrastate and interstate unitary businesses is discriminatory within the meaning ascribed by commerce clause precedent.

3.      *Strict Scrutiny*

The Board contends that even if the taxation scheme's differential treatment discriminates against interstate commerce, it nonetheless passes strict scrutiny because the state has offered a legitimate reason to impose the discriminatory treatment: "[a]llowing multistate unitary businesses to file on a separate basis is subject to *manipulation*, and does not *accurately* reflect in-state income and values attributable to that business in ways that do not exist for in-state businesses," thus "depriv[ing] California of much needed tax revenue." Harley-Davidson counters that the Board has confused both the facts and the law. Regarding the facts, Harley-Davidson asserts that the manipulation and inaccuracy of which the Board complains arise from "separate geographical accounting," not the "separate company reporting" that is at issue here. As for the law, even assuming the Board identified a legitimate local purpose, Harley-Davidson contends the Board ignored the second strict-scrutiny prong, which requires that the scheme's legitimate local purpose be incapable of being " 'adequately served by reasonable nondiscriminatory alternatives.' " (*Oregon Waste*, *supra*, 511 U.S. at pp. 100-

16

101.)  Harley-Davidson asserts the Board fails this prong because other, nondiscriminatory statutes directly address the Board's concerns regarding manipulation and accuracy.[9]

The Board has raised this issue for the first time on appeal.  And because this appeal arises from an order sustaining a demurrer, the record is undeveloped with respect to whether the Board has identified a legitimate reason for differentiating between and discriminating against intrastate and interstate unitary businesses and, if so, whether that legitimate reason can be " 'adequately served by reasonable nondiscriminatory alternatives.' "  (*Oregon Waste*, *supra*, 511 U.S. at pp. 100-101.)  Accordingly, we remand for the trial court to make these determinations in the first instance.

## II.

### *WHETHER THE SUBSIDIARIES HAVE A TAXABLE NEXUS*

Harley-Davidson contends the trial court erred by finding two of its subsidiaries bore a nexus with California sufficient to subject them to taxation here.  Harley-Davidson first challenges the sufficiency of the evidence supporting the trial court's factual findings that the subsidiaries' affiliates were the subsidiaries' agents.  Harley-Davidson then challenges the legal significance of those findings, contending the trial court erred by

---

[9]     Harley-Davidson cites as examples section 25102, which authorizes the Board to recompute a taxpayer's income to "reflect the proper income"; section 25103, which authorizes the Board to require a corporate taxpayer to report facts related to transactions at less than fair value to "prevent evasion of taxes or clearly to reflect the income of such corporation"; and section 25104, which authorizes the Board to require a consolidated report as it deems necessary and further empowers the Board to assess additional tax in order "to prevent evasion of taxes or to clearly reflect the net income earned by said corporation . . . from business done in this [s]tate."

17

concluding the agents' actions were sufficient to establish a nexus on behalf of the subsidiaries.  We disagree in both respects.

A.      *Factual and Procedural Background*[10]

This issue concerns two of Harley-Davidson's financial services subsidiaries: Harley-Davidson Customer Funding Corp. (HDCF) and Eaglemark Customer Funding Corp. IV (FUND4) (together, the special purpose entities or SPEs).  To explain the SPEs' context within the Harley-Davidson corporate family, we must describe generally Harley-Davidson's overall business model.

1.      *General Background*

Harley-Davidson's motorcycle business manufactured motorcycles, and manufactured or purchased for resale motorcycle parts, accessories, and related merchandise.  Headquartered in Milwaukee, Wisconsin, it had manufacturing and distribution facilities in various states, but none in California.  One legal entity in the motorcycle business had a small office in California where it performed design and marketing services.  The motorcycle business did not operate any retail stores; rather, it sold its products at wholesale to unrelated dealers in the United States who resold to retail customers.  There is no dispute regarding the motorcycle business's nexus.

The financial services business, consisting of Harley-Davidson Financial Services, Inc. (HDFS) and its subsidiaries, engaged in financing and insurance.  HDFS was a holding company that provided administrative services—such as executive leadership, finance/accounting/tax, legal, human resources and information technology—to its

_____

[10]     All facts relate to the Years at Issue unless otherwise noted.

subsidiaries.  HDFS was based in Chicago, Illinois, where most of its employees were located.  HDFS also employed regional managers who worked from home and were responsible for educating dealers on the finance and insurance products offered by HDFS's subsidiaries.  There is no dispute regarding HDFS's nexus.

2.      *Financing Motorcycle Purchases*

Many purchasers of Harley-Davidson motorcycles chose to purchase with credit.  They were not obligated to obtain credit through Harley-Davidson.  From January 2000 through July 2002, independently owned Harley-Davidson dealers extended credit directly to some customers via a finance contract.  Beginning in August 2002, a Harley-Davidson-affiliated bank extended loans directly to some purchasers.  In 2002, the bank and its 49 employees were located exclusively in Nevada; it had no offices, agents, employees, or property in California.  Generally, neither the dealers nor the bank held the finance contracts or loans (together, loans) they originated.  Instead, they sold the loans to another wholly owned HDFS subsidiary, Harley-Davidson Credit Corporation (HDCC).

3.      *HDCC*

HDCC's offices were located in Nevada, Illinois, and Texas; it had no property in California and none of its 300-plus employees were based here.  As servicer of the loans, if payments on a loan were not made timely or fully, HDCC employees based in Nevada performed collection activities.  If collection efforts were not successful, HDCC hired third-parties to repossess the motorcycles securing the loans.  Some repossessed motorcycles ended up at auction houses.  An HDCC employee visited an auction house in

California on 17 days total to assist in setting prices for motorcycles or to observe some part of the auction process.

HDCC also made wholesale loans to Harley-Davidson dealers for their purchases of inventory and for upgrades to their showrooms.

4.     *Securitizing and Servicing Loan Pools*

To generate liquidity, HDCC securitized a portion of the consumer loans it purchased. Approximately two to three times per year, HDCC identified and sold a pool of loans to either of the SPEs, which were wholly owned subsidiaries of HDCC. The sale of loans included a security interest that permitted repossession of the underlying motorcycles.

HDCC chose the loans for the pools using a rigorous analytical process that evaluated the substance of each loan and the creditworthiness of each borrower to gauge the likelihood of being repaid timely and in full. The pools included loans that had been originated in California, but the SPEs did not specifically target California or any state— to them, it was irrelevant where the underlying borrowers were located. Neither SPE directed how HDCC, the bank, or the dealers obtained loans.

Pursuant to written agreements, the SPEs established trusts capable of issuing securities. After purchasing loan pools from HDCC at fair value, the SPEs sold the pools (with security interests) to the trusts. The trusts then issued securities backed by the loan pools. Third-party underwriters purchased the securities from the trusts, marketed the securities, and resold them in the open market.

As owners of the loans (through the trusts), the SPEs were responsible for servicing them. They did this by entering into servicing contracts with HDCC, which HDCC performed, primarily from Nevada, for a fee.

5.      *The SPEs*

HDCC could not directly securitize the loans itself because that would expose investors to the risks—particularly the bankruptcy risk—associated with Harley-Davidson's business. Without a shield from a potential bankruptcy, the cost to HDCC to borrow against the underlying loans would have been significantly higher.

Instead, HDCC used the SPEs. They had no offices, agents, employees, or property in California. In fact, they had no employees at all. The SPEs did not advertise or solicit business in California, and nearly all of their functions were completed entirely in Illinois and Nevada.

Each SPE was formed to exist as a corporation distinct from all other Harley-Davidson entities. Each SPE had two independent directors (out of four), kept separate records and accounts, paid its own expenses, was adequately capitalized, and earned a reasonable return on the securitization transactions with HDCC. Each SPE's articles of incorporation (1) prohibited it from undertaking any activities that could cause it to become insolvent; (2) permitted only activities related to acquiring loan receivables and related assets and rights from HDCC, entering into agreements for the servicing and sale of those assets, and engaging in activities necessary, convenient, or advisable to accomplish those ends; and (3) could not be amended without a prior confirmation from

21

ratings agencies that amendment would not affect the rating of securities issued by it through its trusts.

With each securitization, a highly reputable law firm issued a legal opinion confirming the bankruptcy-remote status of the SPEs.

6.     *The Trial Court Ruling*

Following a bench trial, the court found the SPEs taxable in California.  In its statement of decision, the court found that even though the SPEs were separate entities with no direct presence or business activity in California, HDCC, HDFS, and the independent dealers were the SPEs' agents and those agents' activities in California conferred taxable nexus over the SPEs.  The court later clarified in its order denying Harley-Davidson's motion for reconsideration "that the 'substantial nexus' was found under both the [c]ommerce [c]lause and the [d]ue [p]rocess [c]lause."

Harley-Davidson timely appealed.

B.     *Nexus Overview*

"The principle that a [s]tate may not tax value earned outside its borders rests on the fundamental requirement of both the [d]ue [p]rocess and [c]ommerce [c]lauses that there be 'some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.' "  (*Allied-Signal, Inc. v. Director, Div. of Taxation* (1992) 504 U.S. 768, 777, quoting *Miller Brothers Co. v. Maryland* (1954) 347 U.S. 340, 344-345; *Container Corp. of Am. v. Franchise Tax Bd.*, *supra*, 463 U.S. at p. 164 ["Under both the [d]ue [p]rocess and the [c]ommerce [c]lauses of the Constitution, a [s]tate may not, when imposing an income-based tax, 'tax value earned outside its borders.' "].)

22

Although the due process and commerce clauses " 'are closely related,' " they "pose distinct limits on the taxing powers of the [s]tates. Accordingly, while a [s]tate may, consistent with the [d]ue [p]rocess [c]lause, have the authority to tax a particular taxpayer, imposition of the tax may nonetheless violate the [c]ommerce [c]lause." (*Quill Corp. v. North Dakota* (1992) 504 U.S. 298, 305 (*Quill*).)

"Due process centrally concerns the fundamental fairness of governmental activity. Thus, at the most general level, the due process nexus analysis requires that we ask whether an individual's connections with a [s]tate are substantial enough to legitimate the [s]tate's exercise of power over him." (*Quill*, *supra*, 504 U.S. at p. 312.) Therefore, the United States Supreme Court has "often identified 'notice' or 'fair warning' as the analytic touchstone of due process nexus analysis." (*Ibid*.) Consequently, for taxation and personal jurisdiction alike, "the relevant inquiry [is] whether a defendant had minimum contacts with the jurisdiction 'such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " (*Id*. at p. 307, quoting *International Shoe Co. v. Washington* (1945) 326 U.S. 310, 316.) Thus, "if a foreign corporation purposefully avails itself of the benefits of an economic market in the forum [s]tate, it may subject itself to the [s]tate's *in personam* jurisdiction even if it has no physical presence in the [s]tate." (*Quill*, at p. 307.)

"In contrast, the [c]ommerce [c]lause and its nexus requirement are informed not so much by concerns about fairness for the individual defendant as by structural concerns about the effects of state regulation on the national economy." (*Quill*, *supra*, 504 U.S. at p. 312.) State taxation satisfies the commerce clause "[1] when the tax is applied to an

23

activity with a substantial nexus with the taxing [s]tate, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the [s]tate."  (*Complete Auto Transit, Inc. v. Brady* (1977) 430 U.S. 274, 279; *Quill*, at p. 311.)  "The first and fourth prongs . . . limit the reach of state taxing authority so as to ensure that state taxation does not unduly burden interstate commerce. Thus, the 'substantial nexus' requirement is not, like due process' 'minimum contacts' requirement, a proxy for notice, but rather a means for limiting state burdens on interstate commerce."  (*Quill*, at p. 313.)  Therefore, at least in the context of sales and use tax commerce clause nexus, the United States Supreme Court has reiterated a "bright-line, physical-presence requirement."  (*Quill*, at p. 315 ["Whether or not a [s]tate may compel a vendor to collect a sales or use tax may turn on the presence in the taxing [s]tate of a small sales force, plant, or office."]; *National Bellas Hess, Inc. v. Department of Revenue of State of Ill.* (1967) 386 U.S. 753, 758 ["the Court has never held that a [s]tate may impose the duty of use tax collection and payment upon a seller whose only connection with customers in the [s]tate is by common carrier or the United States mail"].)[11]

---

[11]    The *Quill* court recognized that it had "not adopted a similar bright-line, physical-presence requirement" for "other types of taxes."  (*Quill*, *supra*, 504 U.S. at p. 317.) Indeed, the majority of state courts that have considered the issue have concluded that *economic* presence is sufficient to satisfy the commerce clause for taxes other than sales and use taxes.  (See Alexander Smith, *Quill by Affiliation* (2012) 66 U.Miami L.Rev. 755, 762 [collecting cases]; Armikka R. Bryant, *Economic Nexus in Washington State: Defining Substantial Nexus* (2012) 30 Quinnipiac L.Rev. 301, 320-321 [same].)  We need not decide this issue here because, as discussed *post*, the trial court's determination was based at least in part on the physical presence of the SPEs' agent.

The physical-presence requirement need not be satisfied directly by the taxpayer itself; it can be satisfied by independent contractors, "jobbers," and agents acting on the taxpayer's behalf. (*Tyler Pipe Industries v. Dept. of Revenue* (1987) 483 U.S. 232, 250 (*Tyler Pipe*) [independent contractors]; *Scripto v. Carson* (1960) 362 U.S. 207, 211 [jobbers]; *Illinois Commercial Men's Assn. v. State Bd. of Equalization* (1983) 34 Cal.3d 839, 849 (*Illinois Commercial*) [independent contractors]; *Borders Online v. State Bd. of Equalization* (2005) 129 Cal.App.4th 1179, 1189-1190 (*Borders*) [agents].) All that is required is that the " 'activities performed in [the taxing] state on behalf of a taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in the taxing state for the sales.' " (*Tyler Pipe*, at p. 250.)

C.    *Standard of Review*

"On review, the question of jurisdiction is, in essence, one of law. When the facts giving rise to jurisdiction are conflicting, the trial court's factual determinations are reviewed for substantial evidence. [Citation.] Even then, we review independently the trial court's conclusions as to the legal significance of the facts. [Citations.] When the jurisdictional facts are not in dispute, the question of whether the defendant is subject to personal jurisdiction is purely a legal question that we review de novo." (*Dorel Industries, Inc. v. Superior Court* (2005) 134 Cal.App.4th 1267, 1273.)

Under the substantial evidence standard of review, "the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (*Grainger v. Antoyan* (1957) 48 Cal.2d 805, 807, italics omitted.) We are required to

25

accept all evidence that supports the successful party, disregard the contrary evidence, and draw all reasonable inferences to uphold the judgment. (*Minelian v. Manzella* (1989) 215 Cal.App.3d 457, 463.) "While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations]." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) Thus, it is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 766; see *Leff v. Gunter* (1983) 33 Cal.3d 508, 518.) "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652.)

D.      *The SPEs' Nexus with California Satisfies the Due Process and Commerce Clauses*

The trial court found that, "[a]lthough [the SPEs] are separate corporations, HDFS and HDCC are their agents in California . . . ." Harley-Davidson argues substantial evidence does not support the existence of an agency relationship and, even if one existed, that the agents' conduct was insufficient to establish a sufficient nexus with California. We are not persuaded.

1.      *Substantial Evidence Supports the Finding of an Agency Relationship*

" '[T]he existence of an agency relationship is usually a question of fact, *unless the evidence is susceptible of but a single inference.*' " (*Borders*, *supra*, 129 Cal.App.4th at

26

p. 1189.)  "An agent is one who represents another, called the principal, in dealings with third persons.  Such representation is called agency."  (Civ. Code, § 2295; *Borders*, at p. 1189; *Scholastic Book Clubs, Inc. v. State Bd. of Equalization* (1989) 207 Cal.App.3d 734, 737 (*Scholastic*).)  "An agency relationship 'may be implied based on conduct and circumstances.' "  (*Borders*, at p. 1189, quoting *Scholastic*, at pp. 737-738.)

In *Borders*, the Court of Appeal affirmed the trial court's finding that an out-of-state online bookseller (Online) had sufficient nexus with California based on an agency relationship with its sister corporation (Borders), which operated brick-and-mortar stores in California.  (*Borders*, *supra*, 129 Cal.App.4th at p. 1190.)  Although Online and Borders were separately established legal entities owned by Borders Group, Inc., "[t]wo people who served on Online's board of directors also served on Borders's three-person board of directors," and "[a]ll but two of the nine people who served as officers of Online during the disputed period . . . also served as officers of Borders at some point during the disputed period."  (*Id*. at p. 1185.)  The sister entities shared a similar logo and some financial and marketing data, but did not intermingle their corporate assets.  (*Ibid*.)  Despite this corporate separateness, the trial court found—and the Court of Appeal agreed—that each sister-entity's policy allowing for customers to return merchandise purchased from Online at Borders stores located in California established Borders as Online's agent.  (*Id*. at p. 1190.)[12]

---

[12]     In reaching this determination, the *Borders* court relied on *Scholastic*.  There, the Court of Appeal affirmed the trial court's finding that an out-of-state mail-order bookseller had a sufficient taxation nexus with California based on agency relationships

27

Similarly here, although the SPEs are legally separate entities from HDCC, substantial evidence supports the trial court's finding of an agency relationship between the SPEs and HDCC. To begin with, the SPEs were only formed so that HDCC could obtain more favorable pricing from securitization investors than HDCC could obtain by directly securitizing the loans itself. The SPEs were governed by directors and officers who were also directors and officers of HDCC. The SPEs had no employees of their own but, rather, acted entirely through HDCC employees. The SPEs were only permitted to securitize HDCC loans. HDCC selected the pools of loans to securitize, administered the sale of the SPEs' securities to underwriters, and indemnified the underwriters. HDCC undertook collection activities on the SPEs' loans, and it was an HDCC employee who visited an auction house in California on 17 days total to assist in the auction process—a process designed to ensure the value of the collateral securing the loans held by the SPEs. This evidence, and the reasonable inferences derived from it, supports the trial court's finding that HDCC was the SPEs' agent.[13]

---

with in-state school teachers who voluntarily solicited book orders from their students. Although the teachers were not obligated to solicit orders from their students, once they did "they [were] obviously acting under [Scholastic]'s authority, and certainly as [Scholastic]'s agents or representatives." (*Scholastic*, *supra*, 207 Cal.App.3d at p. 737.) "By accepting the orders, the payment and shipping the merchandise, [Scholastic] clearly and unequivocally ratified the acts of the teachers and confirmed their authority as [Scholastic]'s agents or representatives." (*Id*. at p. 738.)

[13] Because of this conclusion, we need not also address the trial court's finding that HDFS and the motorcycle dealers were also the SPEs' agents. Nor, in light of our conclusion, do we need to address Harley-Davidson's contention that substantial evidence does not support the trial court's findings that "HDCC controlled [the SPEs]" and "[the SPEs] were not doing business for themselves but for HDFS."

28

Harley-Davidson argues we should apply a different, more rigid, three-factor test for determining the existence of an agency relationship.[14] We are not convinced, nor was the *Borders* court. In *Borders*, Online argued the trial court erred by not applying "California's 'four-factor test' to review the agency issue." (*Borders*, *supra*, 129 Cal.App.4th at p. 1190.)[15] The *Borders* court disagreed, recognizing that although "it is true courts consider these factors when considering agency issues in various contexts, there is no bright-line 'four-factor test' in determining agency." (*Ibid*.) Indeed, the court explained that "the cases Online relies on to advocate the existence of the so-called 'four-factor test' were decided in other contexts, analyzed far different factual situations, and did not necessarily apply each of the four 'factors' cited by Online." (*Ibid*.) The *Borders* court further noted the *Scholastic* court did not apply the four-factor test proposed by Online. (*Id*. at p. 1191, citing *Scholastic*, *supra*, 207 Cal.App.3d at pp. 737-738 & fn. 1.) For the reasons discussed in *Borders*, we too decline to apply a rigid, three- or four-factor test for determining agency.

Harley-Davidson acknowledges HDCC's auction-related conduct in California was "arguably for the benefit of" the SPEs, but suggests it was not within the course and

---

14    Citing *Alvarez v. Felker Mfg. Co.* (1964) 230 Cal.App.2d 987, 999, Harley-Davidson asserts the "essential characteristics of an agency relationship" are "(1) [a]n agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself; (2) an agent is a fiduciary with respect to matters within the scope of the agency; and (3) a principal has the right to control the conduct of the agent with respect to matters entrusted to him."

15    The four-factor test advocated by Online is essentially the three-factor test advanced by Harley-Davidson plus the additional factor of the agent's consent to act as the principal's agent. (*Borders*, *supra*, 129 Cal.App.4th at p. 1190.)

scope of an agency relationship, presumably because the conduct also benefitted HDCC. The *Borders* court rejected a similar argument, reasoning that "[b]y accepting Online's merchandise under the terms of Online's return policy, Borders was effectuating Online's policy, *even if it was also Borders' own policy*." (*Borders*, *supra*, 129 Cal.App.4th at p. 1191, italics added.) We likewise reject Harley-Davidson's suggestion that HDCC could not have been acting as the SPEs' agent simply because HDCC's actions also happened to benefit itself.

For the foregoing reasons, we conclude substantial evidence supports the trial court's finding that HDCC was the SPEs' agent. We now "review independently the trial court's conclusions as to the legal significance of th[is] fact[]." (*Dorel Industries, Inc. v. Superior Court*, *supra*, 134 Cal.App.4th at p. 1273.)

2.      *The SPEs' Nexus Satisfies the Due Process Clause*

We conclude the SPEs, through their agent HDCC, "had minimum contacts with the jurisdiction 'such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " (*Quill*, *supra*, 504 U.S. at p. 307.) The SPEs' *raison d'être* was to cost-effectively generate liquidity for HDCC so that HDCC could, among other things, make loans to Harley-Davidson dealers—including those in California—for their purchases of inventory and for upgrades to their showrooms. The loan pools contained more loans from California than from any other state.[16] Most

---

16      For example, one prospectus indicates California loans comprised approximately 12 percent of the pool. The next most-represented states were Texas, at approximately 8

importantly, when California consumers defaulted on their loans, HDCC—as the SPEs' agent—oversaw collection activities, including repossession and sale of the motorcycles at California auctions. An HDCC employee even attended auctions on at least 17 different occasions. Under these circumstances, California's taxation of the SPEs comports with " ' "traditional notions of fair play and substantial justice." ' " (*Quill*, at p. 307.)

Harley-Davidson argues, citing *F. Hoffman-La Roche, Ltd. v. Superior Court* (2005) 130 Cal.App.4th 782, that "[u]nder the [d]ue [p]rocess [c]lause, jurisdiction based on agency requires 'pervasive and continuous operational control' over in-state entities by the out-of-state parties." *F. Hoffman-LaRoche* is distinguishable. First, *F. Hoffman-LaRoche* considered due process in the context of *general* personal jurisdiction (*id.* at p. 797), whereas taxation nexus is concerned with *specific* or *limited* personal jurisdiction. *F. Hoffman-LaRoche* acknowledged that a court may exercise specific or limited personal jurisdiction under essentially the same purposeful-availment test enunciated in *Quill*—the test we applied above. (*Ibid.*) Second, *F. Hoffman-LaRoche* "appl[ied] jurisdictional principles with an abundance of caution [because] the defendant is a foreign [i.e., international] corporation." (*Id.* at p. 795.) No similar concern is present here.

Harley-Davidson also argues that under *J. McIntyre Machinery, Ltd. v. Nicastro* (2011) __ U.S. __ [131 S.Ct. 2780] (*J. McIntyre Machinery*), we may only find due process purposeful availment if the SPEs "can be said to have targeted" California. In

percent; Florida, at approximately 7 percent; and Pennsylvania, at approximately 6 percent.

*J. McIntyre Machinery*, a British equipment manufacturer challenged a New Jersey court's finding of personal jurisdiction in a personal injury case brought by a worker who was injured by equipment manufactured by the defendant. The defendant argued it was not subject to personal jurisdiction because (1) all its sales were made through an independent distributor; (2) defendant's officials had attended annual conventions in the United States, but never in New Jersey; and (3) "no more than four machines . . . ended up in New Jersey." (*Id*. at p. 2786.) The New Jersey Supreme Court concluded the state court could exercise personal jurisdiction over the defendant because the defendant had placed its product in the " 'stream-of-commerce' " and, thus, "knew or reasonably should have known 'that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the [50] states." (*Ibid*.) The United States Supreme Court held that more was required: "The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum [s]tate." (*Id*. at p. 2788.)

*J. McIntyre Machinery* is inapposite. First, the SPEs did not act "through an independent distributer," but rather, through their corporate parent with which they shared directors and officers and through which they exclusively acted. Second, the SPEs' agent did target California by attending 17 auctions here to assist in maintaining the value of the motorcycles that secured the loans held by the SPEs.

In sum, we conclude the SPEs had a sufficient nexus with California to satisfy due process concerns.

32

3.      *The SPEs' Nexus Satisfies the Commerce Clause*

Harley-Davidson contends the substantial nexus required by the commerce clause is lacking because the SPEs lacked a physical presence in California. We disagree. As mentioned repeatedly above, the SPEs' agent, HDCC, sent an employee to auctions in California on 17 separate occasions. An agent's presence satisfies the physical presence requirement. (*Tyler Pipe*, *supra*, 483 U.S. at p. 250; *Scripto v. Carson*, *supra*, 362 U.S. at pp. 211-212; *Illinois Commercial*, *supra*, 34 Cal.3d at p. 849; *Borders*, *supra*, 129 Cal.App.4th at pp. 1189-1190.)

Citing *Tyler Pipe*, Harley-Davidson asserts "third parties may give rise to nexus for [an] out-of-state company if . . . their activities were 'significantly associated with the taxpayer's ability to establish and maintain a market in th[e] state.' " (Modification in original.) Harley-Davidson construes *Tyler Pipe* as requiring the third-party's conduct be sales-related. And because the SPEs' market for the sale of securities are underwriters, not California consumers, Harley-Davidson reasons the physical-presence requirement is lacking. This argument fails from the outset, however, because the third-party's in-state conduct need not be sales-related; it need only be "an integral and crucial aspect of the businesses . . . ." (*Illinois Commercial*, *supra*, 34 Cal.3d at p. 840 ["Although plaintiffs assert a distinction between the present case and *Scripto* because the salesmen in *Scripto* solicited business for the foreign corporation, whereas here plaintiffs' agents did not perform that function, we are unimpressed by such distinction. What is significant in the present context is that the investigation and settlement of claims is an integral and crucial aspect of the business . . . ."]; Hellerstein, State Taxation (3d ed. 2014) Jurisdiction to

33

Impose Corporate Income, Franchise, and Capital Stock Taxes, ¶ 6.09[1] ["there is nothing in *Tyler Pipe* that can fairly be read to support the assertion that the *only* acts of independent contractors that are capable of creating nexus over an out-of-state taxpayer are those related to maintaining a market in the state"].) Participating in auctions of repossessed motorcycles to maintain the value of the security interests underlying the securitized loan pools is as integral and crucial to the SPEs' securitization business as was the investigation and adjustment of insurance claims to the insurer in *Illinois Commercial*.

Finally, Harley-Davidson argues that even if HDCC's auction-related conduct would otherwise satisfy the commerce clause's physical-presence requirement, it nonetheless falls short because "these infrequent visits" are "de minimis and do not give rise to substantial nexus." We disagree. *Borders* cited with approval *Arizona Dept. of Revenue v. Care Computer Systems* (Ariz.Ct.App. 2000) 197 Ariz. 414 [4 P.3d 469, 471-472], in which a retailer had one salesman in Arizona approximately two days per year and provided an average of approximately 20 days of training per year to Arizona customers. *Borders* also cited with approval *Orvis Co. v. Tax Appeals Tribunal* (1995) 86 N.Y.2d 165 [630 N.Y.S.2d 680, 654 N.E.2d 954], in which New York's highest court found substantial nexus over an out-of-state seller of computer hardware and software whose sales agreements included a promise to provide one on-site visit should problems arise within 60 days of the sale. (*Id.* at p. 180.) The seller had made 41 such trouble-shooting trips to New York during a three-year period. (*Id.* at pp. 180-181.)

In *Lamtec Corp. v. Dept. of Revenue* (2011) 170 Wn.2d 838 [246 P.3d 788], the Washington Supreme Court found a taxable nexus where, "[a]bout two or three times a year during the tax period at issue, three Lamtec sales employees visited major customers in Washington. During those visits, the employees did not solicit sales directly, but they answered questions and provided information about Lamtec products." (*Id.* at p. 841.)

We conclude the SPEs' agent's participation in 17 auctions in California during the Years at Issue established a substantial nexus for commerce clause purposes.

DISPOSITION

The judgment is reversed to the extent it is based on the superior court's order sustaining the Board's demurrer to Harley-Davidson's first cause of action. The order sustaining the demurrer as to the first cause of action is vacated and the superior court is directed to enter an order overruling the demurrer as to that claim and to conduct further proceedings consistent with this opinion. The judgment is affirmed in all other respects. All parties are to bear their own costs on appeal.

BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

O'ROURKE, J.

35